[No. A129528. First Dist., Div. Five. Sept. 29, 2011.]

In re M.C., a Person Coming Under the Juvenile Court Law.
SAN FRANCISCO HUMAN SERVICES AGENCY, Plaintiff and Appellant,
v.
FELICIA C. et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.C. through F.

**COUNSEL**

Dennis J. Herrera, City Attorney, Kimiko Burton, Lead City Attorney, and Jennifer K. Williams, Deputy City Attorney, for Plaintiff and Appellant.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Plaintiff and Appellant.

Caroline J. Todd, under appointment by the Court of Appeal, for Defendant and Respondent Felicia C.

Matthew I. Thue, under appointment by the Court of Appeal, for Defendant and Respondent Juan E.

Donna Furth, under appointment by the Court of Appeal, for Minor.

Martha Matthews for Children's Law Center of Los Angeles, National Association of Counsel for Children, Northern California Association of Counsel for Children, National Center for Youth Law, Youth Law Center, East Bay Children's Law Offices, and Legal Advocates for Children & Youth as Amici Curiae on behalf of Minor and Defendants and Respondents.

**OPINION**

**BRUINIERS, J.**—When he was 16 years old, M.C. ran away from his home in Guatemala where he lived with his mother, Felicia C. (mother), and his

father, Juan E. (father). He came to San Francisco, where he was found begging for money on the street and was referred to a homeless shelter. The San Francisco Human Services Agency (Agency) investigated allegations of abuse and neglect to determine if M.C. was a dependent child, within the meaning of Welfare and Institutions Code section 300,[1] and declined to file a dependency petition. Legal Services for Children (LSC), serving as counsel to M.C., challenged the Agency's decision not to initiate dependency proceedings by filing an application, pursuant to section 331, seeking juvenile court review. The juvenile court ordered the Agency to file a dependency petition and to take M.C. into protective custody. The juvenile court subsequently declared M.C. a dependent child (§ 300, subds. (b), (c), (g)).

In the published portion of our opinion, we address whether section 331 violates the doctrine of separation of powers, to the extent it authorizes the juvenile court to order the Agency to file a dependency petition. We hold that, under the authority of section 331, the juvenile court may order the Agency to file a dependency petition and that this authority does not violate the separation of powers doctrine. In the unpublished portion of our opinion, we reject the Agency's various challenges to the court's jurisdictional and dispositional findings and orders.

## I. STATUTORY BACKGROUND

Before addressing the facts unique to this case, we think it necessary to first discuss the governing statutes. The juvenile court system is a statutory creation. (See *In re Ramon M.* (2009) 178 Cal.App.4th 665, 672 [101 Cal.Rptr.3d 158] [delinquency case].) "A 'juvenile court' is a superior court exercising limited jurisdiction arising under juvenile law. [Citation.] Dependency proceedings in the juvenile court are special proceedings with their own set of rules, governed, in general, by the Welfare and Institutions Code." (*In re Chantal S.* (1996) 13 Cal.4th 196, 200 [51 Cal.Rptr.2d 866, 913 P.2d 1075].) "Under section 300, a child who is neglected or abused falls within the juvenile court's protective jurisdiction as a 'dependent child of the court.' Alternatively, the juvenile court may take jurisdiction over a minor as a 'ward of the court' when the child is habitually disobedient or truant (§ 601), or commits a crime (§ 602)." (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1123 [93 Cal.Rptr.3d 418].)

The dependency statutes provide different avenues for presenting a child's circumstances to the juvenile court. Juvenile dependency petitions are filed by

---

[1] Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

social workers. (§ 325.)[2] Thus, social workers are required to investigate suspected cases of child neglect and abuse and determine whether dependency proceedings should be commenced. (§ 328.)[3] If the social worker determines that a child is within the jurisdiction of the juvenile court, the social worker may decide that informal supervision is appropriate, in lieu of filing a dependency petition. (§ 301.)[4] If a child has been taken into custody and cannot be released to the custody of his or her parents, a social worker must immediately file a dependency petition with the juvenile court. (§§ 309, subd. (a), 311, subd. (a), 313, subd. (a).)[5]

The statutes also provide methods for private parties to bring a minor's case to the attention of a social worker and juvenile court. (§§ 329, 331.)

[2] Section 325 provides: "A proceeding in the juvenile court to declare a child to be a dependent child of the court is commenced by the filing with the court, by the social worker, of a petition, in conformity with the requirements of this article."

[3] Section 328 provides, in relevant part: "Whenever the social worker has cause to believe that there was or is within the county, or residing therein, a person described in Section 300, the social worker shall immediately make any investigation he or she deems necessary to determine whether child welfare services should be offered to the family and whether proceedings in the juvenile court should be commenced. If the social worker determines that it is appropriate to offer child welfare services to the family, the social worker shall make a referral to these services pursuant to Chapter 5 (commencing with Section 16500) of Part 4 of Division 9."

[4] Section 301, subdivision (a) provides: "In any case in which a social worker, after investigation of an application for petition or other investigation he or she is authorized to make, determines that a child is within the jurisdiction of the juvenile court or will probably soon be within that jurisdiction, the social worker may, in lieu of filing a petition or subsequent to dismissal of a petition already filed, and with consent of the child's parent or guardian, undertake a program of supervision of the child. If a program of supervision is undertaken, the social worker shall attempt to ameliorate the situation which brings the child within, or creates the probability that the child will be within, the jurisdiction of Section 300 by providing or arranging to contract for all appropriate child welfare services pursuant to Sections 16506 and 16507.3, within the time periods specified in those sections. No further child welfare services shall be provided subsequent to these time limits. If the family has refused to cooperate with the services being provided, the social worker may file a petition with the juvenile court pursuant to Section 332. Nothing in this section shall be construed to prevent the social worker from filing a petition pursuant to Section 332 when otherwise authorized by law."

[5] Section 309, subdivision (a), provides: "Upon delivery to the social worker of a child who has been taken into temporary custody under this article, the social worker shall immediately investigate the circumstances of the child and the facts surrounding the child's being taken into custody and attempt to maintain the child with the child's family through the provision of services. The social worker shall immediately release the child to the custody of the child's parent, guardian, or responsible relative unless one or more of the following conditions exist: [¶] (1) The child has no parent, guardian, or responsible relative; or the child's parent, guardian, or responsible relative is not willing to provide care for the child. [¶] (2) Continued detention of the child is a matter of immediate and urgent necessity for the protection of the child and there are no reasonable means by which the child can be protected in his or her home or the home of a responsible relative. [¶] (3) There is substantial evidence that a parent, guardian, or custodian of the child is likely to flee the jurisdiction of the court. [¶] (4) The child has left a placement in which he or she was placed by the juvenile court. [¶] (5) The

Section 329 provides: "Whenever any person applies to the social worker to commence proceedings in the juvenile court, the application shall be in the form of an affidavit alleging that there was or is within the county, or residing therein, a child within the provisions of Section 300, and setting forth facts in support thereof. The social worker shall immediately investigate as he or she deems necessary to determine whether proceedings in the juvenile court should be commenced. If the social worker does not take action under Section 330[6] and does not file a petition in the juvenile court within three weeks after the application, he or she shall endorse upon the affidavit of the applicant his or her decision not to proceed further and his or her reasons therefor and shall immediately notify the applicant of the action taken or the decision rendered by him or her under this section. The social worker shall retain the affidavit and his or her endorsement thereon for a period of 30 days after notifying the applicant."

Section 331 provides: "When any person has applied to the social worker, pursuant to Section 329, to commence juvenile court proceedings and the social worker fails to file a petition within three weeks after the application, the person may, within one month after making the application, apply to the juvenile court to review the decision of the social worker, and the court may either affirm the decision of the social worker or order him or her to commence juvenile court proceedings."

It is the latter section we consider here.

## II. Factual and Procedural Background[7]

*Section 329 Application*

On August 31, 2009, LSC submitted, to the Agency, an application to commence juvenile dependency proceedings by affidavit, pursuant to section

---

parent or other person having lawful custody of the child voluntarily surrendered physical custody of the child pursuant to Section 1255.7 of the Health and Safety Code and did not reclaim the child within the 14-day period specified in subdivision (e) of that section."

Section 311, subdivision (a), provides: "If the probation officer determines that the minor shall be retained in custody, he or she shall immediately file a petition pursuant to Section 332 with the clerk of the juvenile court who shall set the matter for hearing on the detention hearing calendar."

Section 313, subdivision (a), provides: "Whenever a minor is taken into custody by a peace officer or probation officer, except when such minor willfully misrepresents himself as 18 or more years of age, such minor shall be released within 48 hours after having been taken into custody, excluding nonjudicial days, unless within said period of time a petition to declare him a dependent child has been filed pursuant to the provisions of this chapter."

[6] Section 330 was renumbered as section 301 in 1991. (Stats. 1991, ch. 1203, § 4, p. 5867.)

[7] Additional factual and procedural details, including a description of the evidence presented at the contested jurisdiction hearing, are provided in the discussion of the Agency's specific claims.

329. The application alleged that M.C. was currently homeless after coming to San Francisco, from Guatemala, to escape physical abuse by his father. M.C. had been referred to Huckleberry House for emergency shelter and then to Diamond Youth Shelter. The application also noted that both Huckleberry House and LSC had made hotline referrals to Child Protective Services (CPS).

The application further states: "The CPS investigation was closed August 26, 2009. It was explained to our office that the case was closed because [M.C.] was classified as a runaway. [¶] . . . Diamond Youth Shelter is not an appropriate placement for this minor. . . . An emergency housing shelter is an insufficient solution to [M.C.]'s problem of homelessness due to abuse by his father. [¶] . . . [M.C.] cannot return to his country of origin, Guatemala, as there is no one to care for him."

On September 15, 2009, Kristina Hermann, a social worker with the Agency, declined to commence juvenile court proceedings on behalf of M.C. Hermann endorsed the section 329 application and attached a statement of reasons for her decision. She stated that she met with M.C. on August 3, 2009, and concluded that the allegations of abuse and abandonment were unfounded. She explained: "[M.C.] stated that he is from a small town in Guatemala . . . . [M.C.] stated that he 'chose to leave Guatemala in June 2009, in search of employment and educational opportunities.' [M.C.] reported . . . that his parents and his siblings do not know that he left home for the U.S. [¶] . . . [M.C.] stated that his father has a history of drinking alcohol. He stated that in [his] country, 'it is common for men to drink after work.' . . . [M.C.] stated that his parents were not emotionally or physically abusive to him. [M.C.] stated that his father hit him only once, 'with an open hand to his face but it did not leave a bruise.' [M.C.] stated that his father and mother were not abusive to him. [M.C.] did report that there have been occasions when [his] father engaged in a physical altercation with [his] mother. [M.C.] stated that he witnessed the altercations a few times.

"[M.C.] reported that the town that he is from has limited economic opportunity and that his family has always struggled to make a living. He reported that he has 10 other siblings who have remained in the town and have not left for the U.S. as he did. [M.C.] stated that he left school at age 9 to work in construction, something he said 'is not that uncommon for guys where I'm from.' [M.C.] reported that his parents do provide adequate provisions at home for him and his siblings.

"[M.C.] stated that in or around June of 2009, he was invited by an older coworker, 'Felipe' whom he worked with, to come to San Francisco, CA, to better his life. [M.C.] chose to leave Guatemala and his hometown despite the

fact that he did not tell his parents that he was choosing to runaway to the U.S. [M.C.] reported that his parents still do not know that he left Guatemala for the U.S. He told [me] that there is no way of contacting them; neither by phone nor by mail. . . .

"[M.C.] reported that the trip to the U.S. took about 2 and a half weeks . . . and stated that they mostly hitch hiked rides with 'Felipe', and Coyotes . . . . [M.C.] stated that when he arrived in S.F., he panhandled for money in front of Safeway on Mission St. There he said, he met a man . . . who [M.C.] said, 'let me stay with him for several nights,' and then brought him to [LSC]. He completed an intake there and was then brought to Huckleberry House. [M.C.] stated that he does not have any way of contacting the gentleman who brought him to LSC. [¶] . . . [¶]

"[M.C.] stated that he came to the U.S. to go to school and work. [M.C.] reported that he is not afraid of his parents or to go back home to Guatemala, but that he would rather stay in the U.S., where he has more opportunity to work and attend school. [M.C.] does not have any relatives or friends here in the U.S. [M.C.] will be transitioning to live at Larkin Street Youth Services's [sic] shelter program where [he] will reside with case management services. [¶] . . . [¶]

"On 8/21/09, [I] spoke with [my supervisor] who stated that it seems clear that [M.C.] is a runaway minor and based upon the facts provided by [him], the allegations of abuse and neglect are unfounded. [M.C.] is not afraid to return home, and ther[e] are no safety factors presenting [sic] him from living in Guatemala, and [he] can in fact be transported back to Guatemala with the transportation assistance of [the Agency]."

On August 21, 2009, Hermann met with M.C. again, at his school. M.C. reported that "[he] has been attending school consistently, and living at Larkin Street Youth Services Diamond/Drop In Shelter for youth." He also stated that he had not had any contact with anyone in Guatemala. M.C. provided two phone numbers for contacts in Guatemala, neither of which were working numbers.

Hermann's report concluded: "It is [my] assessment . . . that [M.C.] has chose[n] to leave/runaway from his family and hometown behind in Guatemala in search of employment and educational opportunities in the U.S. While [M.C.]'s family is limited by their economic situation, [he] has stated, he 'is not fearful to return home.' He further added that he 'would rather stay in the U.S. to go to school and find work.' The allegations of abuse and neglect are unfounded as there is no evidence of abuse or neglect by his

parents. Despite the limited economic conditions as described by [M.C.], he also reported that his family does provide adequate provisions for him and his siblings."

*Section 331 Application*

On September 29, 2009, LSC filed an application with the juvenile court, pursuant to section 331, seeking review of Hermann's decision. The section 331 application included a copy of the endorsed section 329 application. Attached was the above quoted statement of Hermann's reasons for declining to take action.

A declaration from M.C. was also submitted with the section 331 application. In his declaration, M.C. stated: "I do not have any family members in the United States. [¶] . . . [¶] . . . My father is an alcoholic. When my father was drunk he would physically abuse my mother. I would get very upset every time I saw my father treat my mother this way but she had no other way to support herself. She has heart disease and cannot work. Many times I would get in his way to try and protect my mother and then he would hit me too. He was also violent toward my brothers and sisters. [¶] . . . Because of my father's drinking, there was never enough food to eat. I would give my mom the money that I earned so that she could use it to buy food for us. When my father worked he used his money to buy alcohol instead of food. My mother would also borrow money from my aunt to feed us. We do not have much land but there was an apple tree that we would eat from when we were very hungry. When the economy started getting bad, the money I made was not enough to support my family. . . . [¶] . . . [¶] . . . One day I met a man who said that he could bring me to the United States if I paid him 2,000 Quetzales (Guatemalan currency). . . . I could not stand the physical and emotional abuse from my father anymore and thought it was a good idea to leave with this man. I used my savings to pay the way. . . . [¶] . . . I came to the United States by bus and truck with the man that I had paid. The trip took many days and I crossed a desert and stopped in several big cities. After some days had passed, the man said we had arrived in San Francisco. We walked into a store and the man said that we would eat a sandwich and then he would take me with him to work. He told me to wait for him inside the store. I waited for many hours but the man never came back. While I was waiting I began to ask for money because I was very hungry. A man named Isidro came up to me and asked what I was doing in the store and where I was from. I told him that I had just come from Guatemala. Isidro took me to his home and gave me some food. He said that he could not afford to keep me in his house but that he would take me to [LSC.] [¶] . . . [¶] . . . I live at Diamond Youth Shelter with other kids. Because I cannot go there until it is late at night I try to do my homework at the Drop-In Office at Larkin

Street. . . . [T]hey do not let us inside [the shelter] until 8:00 p.m. The times that I have arrived at the Shelter before it is open, I have had to wait outside in the cold."

On the same day that the application was filed, the juvenile court (Judge Hitchens) ordered the social worker "to commence proceedings by filing a petition pursuant to . . . section 300 based on the allegations set forth in this application." The Agency moved to set aside the order, arguing that the Agency had had no opportunity to be heard and that the order was not properly served. The Agency and M.C.'s counsel were notified that the juvenile court would hold a hearing on October 7, 2009. Thereafter, the Agency filed a "Trial Brief," in which it argued, among other things, that section 331 violates the separation of powers doctrine and is unconstitutional.

At the hearing, the Agency requested the opportunity to present evidence. The court denied the request, stating: "[T]hat's what the jurisdictional phase is for. You don't get a trial on this particular issue, so I'm not going to allow that. I am going to order the [Agency] to file a petition. Obviously because it's a situation where the roles are somewhat reversed at the jurisdictional hearing in this matter, the burden is really going to fall on [M.C.] instead of the [Agency.] [¶] But I think there are sufficient allegations in this case to show that there is a prima facie showing that this child is an abused and neglected child to at least proceed."

On October 7, 2009, Judge Hitchens entered the following order (October 7 Order): "The Court, having heard further argument . . . , hereby affirms its decision initially made on September 29th, 2009 and orders the social worker to immediately commence proceedings in this matter. The [Agency] is ordered to take [M.C.] into its protective custody no later than 5pm on October 14, 2009."

*Writ Review and Protective Custody Warrant*

On October 9, 2009, the Agency filed a petition for writ of mandate (*San Francisco Human Services Agency v. Superior Court* (2009, A126368)) with this court. The Agency argued, among other things, that section 331 violates the separation of powers doctrine.[8] Pending further consideration of the petition for writ of mandate, we initially stayed the October 7 Order. Following briefing, we denied the petition and dissolved the stay. Specifically, our order, dated December 23, 2009, provided: "The petition for writ of mandate is denied, as [the Agency] has not persuasively demonstrated that it

---

[8] The Agency has filed a request for judicial notice of the documents filed in the writ proceeding. We originally deferred ruling on this request, but now grant the unopposed request. (Evid. Code, § 452, subd. (d)(1).)

does not possess other adequate remedies at law to obtain a cessation of juvenile court proceedings, or that [it] cannot take steps to avoid the irreparable harm claimed in the petition. The court notes that [the Agency] does not contend that it lacks the ability to initiate a declaratory relief action to challenge . . . section 331 on separation of powers grounds. The previously issued stay is hereby ordered dissolved." The Supreme Court denied the Agency's petition for review.

*Application for Protective Custody Warrant*

On January 13, 2010, the new social worker assigned to the case, Erin Monahan, applied for a protective custody warrant, pursuant to section 340.[9] Monahan stated that she had interviewed M.C. on December 29, 2009. Monahan summarized that interview as follows: "[M.C.] indicated that both of his parents are good people and that he was well taken care of in Guatemala. He fondly recalled how his mother provided him with oil for his throat when he had been ill. His family in Guatemala is large and has helped his parents take care of [M.C.] and his 10 siblings. [¶] [M.C.] told me his father drank and sometimes 'drank away the money,' but that was what 'men do where I am from.' His extended family helps provide for the family in instances where it is necessary. [M.C.] indicated to me, as he did to Hermann in August, that his father hit him once, but left no mark or bruise. He said that there was no pattern of violence and his father never hit him again. [¶] When asked if his father was violent when he drank, [M.C.] was adamant that he was not. He further indicated that his father was not verbally abusive. [¶] . . . [¶] I discussed with [M.C.] the meaning of abuse and neglect, and he reiterated that he had been neither abused nor neglected in Guatemala. When asked if he was safe where he was, he indicated that he felt safe—that no one was hurting him or threatening him in any way. [¶] At the end of our discussion, I again asked [M.C.] if he was afraid of his parents or if he was afraid to return to Guatemala. He said he was not, but that he came to the United States to make money and be able to send some money back to Guatemala. He told me he was not running *from* anything, but was coming to the United States to seek a better life."

With respect to his life in San Francisco, Monahan wrote: "[M.C.] attends school regularly and takes advantage of services offered to him at school including after school tutoring and help with his homework. [¶] During

---

[9] Section 340 provides: "Whenever a petition has been filed in the juvenile court alleging that a minor comes within Section 300 and praying for a hearing thereon, or whenever any subsequent petition has been filed praying for a hearing in the matter of the minor and it appears to the court that the circumstances of his or her home environment may endanger the health, person, or welfare of the minor, or whenever a dependent minor has run away from his or her court ordered placement, a protective custody warrant may be issued immediately for the minor."

school, he is provided free breakfast and lunch. During breaks from school, he gets free breakfast at the shelter. During the day he goes to the Drop in Center where he is provided lunch. The shelter offers dinner every night. [¶] The Drop in center, where [M.C.] can spend the day, closes at 7:30, and the Shelter opens at 8:00pm. [M.C.] indicated to me that he sometimes misses dinner. I contacted the shelter and confirmed that [M.C.] can tell the shelter in the morning if he will not be back in time for dinner and they will save him a plate of food. Residents of the shelter can get up to five meals a day . . . . [¶] [M.C.] indicated that the shelter provides a jacket for him—although he doesn't always wear it as he finds it too warm. I also confirmed that there is medical attention available at the shelter should it be necessary. [¶] . . . [¶] Late in the week of January 4, 2010, the [Agency] received a referral on [M.C.] indicating that he had a fever and there was no one to take him home."

Monahan concluded: "In my professional opinion—based on 20 years of child welfare investigations, [M.C.] has not been abused or neglected, nor is he facing immediate risk of harm where he currently resides. His basic needs are more than being met. Nonetheless, I understand in October 2009, the Juvenile Court ordered the Agency to take [M.C.] into protective custody. Since that order is over ten weeks old, I am seeking a warrant authorizing the Agency to take [M.C.] into protective custody." Judge Mahoney signed and issued the warrant the same day.

*Dependency Petition and Detention Report*

On January 15, 2010, the Agency filed a dependency petition on behalf of M.C., alleging that "minor's counsel claims" M.C. comes within the court's jurisdiction pursuant to section 300, subdivisions (b), (c) and (g). The Agency also filed a motion to dismiss the petition, asserting that it failed to state a cause of action.

The detention report, filed by Monahan on January 15, 2010, indicated that M.C. had been placed in a foster home. In that report, Monahan reiterated the facts she submitted in her request for a protective custody warrant. She also added: "Numerous phone calls . . . have been made to Guatemala to the parents and to the Guatemalan Consulate, but these have . . . proved unfruitful in locating the parents."

At the detention hearing, on January 19, 2010, Commissioner Lyons appointed counsel for mother and father. The court continued the matter for a contested detention hearing on February 4, 2010. On February 4, 2010, the juvenile court continued the matter again in order to find an appropriate interpreter, after learning that M.C.'s native language was Quiché (Mayan) and not Spanish. The matter was eventually set for April 26, 2010.

*Contested Detention and Motion to Dismiss Hearing*

By the time of the contested detention hearing, which took place on April 26 and May 13, 2010, mother and father had been located and were represented by appointed counsel. They submitted to detention. After the presentation of evidence by the Agency and M.C., the court found that father is M.C.'s presumed father. The court also found that a prima facie case had been made for detention and denied the motion to dismiss. Commissioner Lyons said: "I believe there's been enough evidence brought to the Court's attention that [M.C.] does come within 300(B)." M.C. was ordered detained in foster care.

*Contested Jurisdiction/Disposition Hearing*

In preparation for the contested jurisdiction hearing, Monahan filed a dismissal report, asking the court to dismiss the dependency petition. She wrote: "[I] must give the professional opinion that particularly in these budgetary times, it is not prudent nor is it appropriate to be using the Child Welfare system's thin resources for a person who does not appear to be at risk for harm (either if he stays here or if he returns to Guatemala). [M.C.] is almost an adult and seems to be able to navigate his world quite well. He has no special needs or disabilities and in fact appears quite healthy and happy and mature."[10]

The contested hearing was held on July 26, 2010, before Judge Chaitin. The Agency and M.C. presented the testimony of several witnesses and the court admitted into evidence the detention and dismissal reports, among other exhibits. Notably, M.C. testified that his father beat him "many times."

In closing argument, the Agency's counsel questioned M.C.'s credibility. M.C.'s counsel urged the court to find jurisdiction, arguing, "even putting aside 300B allegations, it's unequivocal that [M.C.] falls within court jurisdiction under section 300G, that he has been left without any provision for support." Mother's counsel noted: "[T]here's no question he is in the country in a jurisdiction where he has no parents or no provision for support. And the statute is quite clear. It makes no distinction between the child of one country to another country so long as the child is under 18 at the time jurisdiction is established. [¶] I think that statute is exactly there to protect this type of child who is found in a foreign country. We would want the same thing to happen to any kid in any other country." Father's counsel added: "[F]ather does support [M.C.]'s position here. And the evidence does seem to show that this family is unable or incapable at this time of providing for his needs."

---

[10] M.C. turned 18 years old in September 2010.

*Jurisdictional and Dispositional Findings*

The court sustained the dependency petition and adjudged M.C. to be a dependent of the juvenile court. The court made the following findings:

—M.C. was physically abused by father while living in Guatemala;

—mother and father engaged in domestic violence in the home;

—M.C. was impacted negatively by the domestic violence;

—father has an alcohol problem and cannot parent M.C.;

—mother cannot protect M.C. from father;

—father has caused M.C. serious emotional damage as evidenced by the anxiety, stress and fear he expresses at the thought of returning home;

—M.C. is homeless and suffers severe anxiety as a result;

—M.C. has been left without any provision for support;

—M.C. has been sleeping at Diamond Youth Center which is inappropriate;

—there would be a substantial danger to M.C.'s physical safety or physical/emotional well-being if he were returned home;

—there is no reasonable means by which M.C.'s physical health can be protected without removal from the parents' custody.

M.C. was ordered placed in foster care. Reunification requirements were ordered "to be filed at [a] later date." On August 19, 2010, the Agency filed a notice of appeal.

### III. DISCUSSION

On appeal, the Agency contends (1) that the juvenile court's October 7 Order was either unauthorized by statute or in violation of the doctrine of separation of powers; (2) that substantial evidence does not support the findings made in connection with issuance of the protective custody warrant; (3) that the court's jurisdictional and dispositional findings are not supported by substantial evidence; (4) that the court lacked jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA; Fam.

Code, § 3400 et seq.); and (5) that the juvenile court abused its discretion in making certain evidentiary rulings at the contested jurisdiction/disposition hearing. M.C., mother, and father urge us to affirm the juvenile court's orders.[11] We agree that none of the Agency's arguments necessitate reversal.

## A. *Appealability*

█ First, we consider whether the challenged orders preceding the dispositional order are reviewable on this appeal. Appeals in dependency proceedings are governed by section 395, which provides: "A judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment. . . ." (§ 395, subd. (a)(1).) In dependency cases, the dispositional order is generally the first appealable order. (*In re Joann E.* (2002) 104 Cal.App.4th 347, 353–354 [128 Cal.Rptr.2d 189]; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1250 [98 Cal.Rptr.2d 844].) However, jurisdictional findings and other orders entered before the dispositional hearing are generally reviewable on appeal from the dispositional order. (*In re Joann E., supra,* 104 Cal.App.4th at p. 353 ["[i]f there is no specific statutory requirement that a writ be taken before a final, appealable order or judgment is entered, review of intermediate rulings and orders may occur on appeal"]; *In re Athena P.* (2002) 103 Cal.App.4th 617, 624 [127 Cal.Rptr.2d 46]; *In re Megan B.* (1991) 235 Cal.App.3d 942, 950 [1 Cal.Rptr.2d 177] ["[a] jurisdictional finding, while not appealable, may be reviewed in an appeal from the dispositional order"]; Code Civ. Proc., § 906.)

One could argue that the October 7 Order, requiring the Agency to file the dependency petition, was separately appealable as a final order in a collateral proceeding, in which case the time to appeal has expired. (Cf. *In re Keisha T.* (1995) 38 Cal.App.4th 220, 229 [44 Cal.Rptr.2d 822] [order granting a petition for press inspection of juvenile court records under § 827 "is appealable as a final judgment in a special proceeding" because the "petitions were not part of the dependency proceedings; the petitions commenced a special proceeding on a collateral matter"].) But here, we cannot say that the section 331 application was separate and apart from the dependency proceedings. There would have been no dispositional order in this case if it were not for the October 7 Order compelling the Agency to initiate dependency

---

[11] We also received an amici curiae brief, in support of M.C.'s position, from the Children's Law Center of Los Angeles, the National Association of Counsel for Children, the Northern California Association of Counsel for Children, the National Center for Youth Law, the Youth Law Center, the East Bay Children's Law Offices, and Legal Advocates for Children & Youth. We will hereinafter refer to this brief as the Children's amici curiae brief. In addition, the California State Association of Counties (CSAC) filed an amicus curiae brief in support of the Agency's position.

proceedings. We conclude that the Agency properly challenges the October 7 Order and the jurisdictional findings on appeal from the dispositional order.[12]

■ Next, we turn to the issue of mootness. M.C. argues that the Agency's objections to the October 7 Order have been mooted by the intervening jurisdictional findings. "An appellate court will not review questions which are moot and only of academic importance, nor will it determine abstract questions of law at the request of a party who shows no substantial rights can be affected by the decision either way. [Citation.] An appeal becomes moot when, through no fault of the respondent, the occurrence of an event renders it impossible for the appellate court to grant the appellant effective relief. [Citations.] On a case-by case basis, the reviewing court decides whether subsequent events in a dependency case have rendered the appeal moot and whether its decision would affect the outcome of the case in a subsequent proceeding. [Citation.]" (*In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054–1055 [81 Cal.Rptr.3d 556].) M.C.'s argument has merit. But we note that the Agency's primary argument is not that Judge Hitchens abused her discretion in making the October 7 Order, or that her order was unsupported by substantial evidence. Rather, the Agency challenges the juvenile court's power to make such an order. The statutory interpretation and separation of powers questions before us are of continuing public importance and similar disputes are likely to arise in the future. Accordingly, we will exercise our discretion to address these issues. (See *In re Christina A.* (2001) 91 Cal.App.4th 1153, 1158–1159 [111 Cal.Rptr.2d 310].)

We will not, however, address the Agency's challenge to the juvenile court's January 13, 2010 issuance of the protective custody warrant.[13] The parties agreed, at oral argument, that the court's intervening orders render any error in the warrant's issuance moot. (See *In re Richard D.* (1972) 23 Cal.App.3d 592, 595 [100 Cal.Rptr. 351] [erroneous failure to follow detention hearing procedural requirements rendered moot by subsequent wardship jurisdiction and disposition proceedings].) The Agency only argues that there was insufficient evidence to support issuance of the warrant. This is not an issue of continuing public importance.

### B. *Does Section 331 Violate the Separation of Powers Doctrine*

The primary issue presented is whether section 331 violates the separation of powers to the extent it authorizes the juvenile court to order a social

---

[12] We express no opinion on whether an order *affirming* the social worker's decision not to initiate dependency proceedings is separately appealable.

[13] The Agency's notice of appeal specifies the detention order, dated May 13, 2010, as being subject to challenge, and not the January 13, 2010 issuance of the protective custody warrant. However, the May 13, 2010 order is not addressed in the Agency's opening brief.

services agency to file a dependency petition, over the agency's objection. This is a question of first impression. The Agency argues that a literal application of the statute unconstitutionally allows the juvenile court to usurp a power vested exclusively in the executive branch. Therefore, the Agency urges a narrow statutory construction, permitting the juvenile court only to review an agency decision not to file a dependency petition for abuse of discretion. According to the Agency, if abuse is demonstrated, the court may only order further investigation by the social services agency.

■ The California Constitution provides: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.)[14] "The legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly . . . ." (Cal. Const., art. IV, § 1.) "The supreme executive power of this State is vested in the Governor. The Governor shall see that the law is faithfully executed." (Cal. Const., art. V, § 1.) The judicial power is vested in the courts. (Cal. Const., art. VI, § 1.) "[T]he essential power of the judiciary [is] to resolve 'specific controversies' between parties." (*People v. Bunn* (2002) 27 Cal.4th 1, 15 [115 Cal.Rptr.2d 192, 37 P.3d 380].)

■ "Although the language of California Constitution article III, section 3, may suggest a sharp demarcation between the operations of the three branches of government, California decisions long have recognized that, in reality, the separation of powers doctrine ' "does not mean that the three departments of our government are not in many respects mutually dependent" ' [citation], or that the actions of one branch may not significantly affect those of another branch. . . . [¶] At the same time, [the separation of powers] doctrine unquestionably places limits upon the actions of each branch with respect to the other branches." (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52–53 [51 Cal.Rptr.2d 837, 913 P.2d 1046].)

The Constitution "vest[s] each branch with certain 'core' [citation] or 'essential' [citation] functions that may not be usurped by another branch." (*People v. Bunn, supra,* 27 Cal.4th at p. 14.) "The separation of powers doctrine limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch. [Citations.] ' "The courts have long recognized that [the] primary purpose [of the separation-of-powers doctrine] is to prevent the combination in the hands of a single person

---

[14] The Agency is a local government agency, to which article III, section 3 of the California Constitution, does not expressly apply. Separation of powers principles are nevertheless applicable because "the county social service agencies . . . are performing powers of the state executive branch and are subject to the administration, supervision and regulation of the State Department of Social Services. (§ 202.5.)" (*In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1235–1236, fn. 6 [255 Cal.Rptr. 344] (*Danielle W.*).)

or group of the basic or fundamental powers of government." ' [Citations.] To serve this purpose, courts ' "have not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch." ' [Citation.]" (*Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 297 [105 Cal.Rptr.2d 636, 20 P.3d 533] (*Carmel Valley Fire Protection Dist.*).)

■ "The doctrine, however, recognizes that the three branches of government are interdependent, and it permits actions of one branch that may 'significantly affect those of another branch.' [Citation.] . . . 'The purpose of the doctrine is to prevent one branch of government from exercising the *complete* power *constitutionally vested* in another [citation]; it is not intended to prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch.' (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 117 [145 Cal.Rptr. 674, 577 P.2d 1014].)" (*Carmel Valley Fire Protection Dist., supra*, 25 Cal.4th at p. 298, some italics added.) One branch of government may perform an act or exercise a function affecting another branch provided it does not "defeat or materially impair" the exercise of a power of the other branch. (*Id.* at p. 305.) " ' "The [separation of powers] doctrine has not been interpreted as requiring the rigid classification of all the incidental activities of government, with the result that once a technique or method of procedure is associated with a particular branch of the government, it can never be used thereafter by another. . . ." [Citation.]' " (*In re Attorney Discipline System* (1998) 19 Cal.4th 582, 596 [79 Cal.Rptr.2d 836, 967 P.2d 49], italics omitted.)

### 1. *Statutory Interpretation*

First, the Agency attempts to persuade us to limit section 331 through statutory interpretation. (See *People v. Bowen* (1991) 231 Cal.App.3d 783, 789 [283 Cal.Rptr. 35] ["constitutional questions are to be avoided when a case may be decided on other grounds"].) The Agency argues that "[t]he [juvenile] court's jurisdiction under the statute should extend only to ordering the Agency to investigate allegations of abuse or neglect and to reviewing the Agency's decision whether to commence juvenile court proceedings for legal error or a clear abuse of discretion. In the event the court finds legal error or · abuse of discretion, the remedy would not be to order the [A]gency to file a petition but rather to revisit the matter consistent with the legal standards the court sets down."

■ We review questions of statutory interpretation de novo. (*County of Alameda v. Pacific Gas & Electric Co.* (1997) 51 Cal.App.4th 1691, 1698 [60

Cal.Rptr.2d 187].) "The primary duty of a court when interpreting a statute is to give effect to the intent of the Legislature, so as to effectuate the purpose of the law. [Citation.] To determine intent, courts turn first to the words themselves, giving them their ordinary and generally accepted meaning. [Citation.] If the language permits more than one reasonable interpretation, the court then looks to extrinsic aids, such as the object to be achieved and the evil to be remedied by the statute, the legislative history, public policy, and the statutory scheme of which the statute is a part. [Citation.] . . . Ultimately, the court must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and it must avoid an interpretation leading to absurd consequences. [Citation.]" (*In re Luke W.* (2001) 88 Cal.App.4th 650, 655 [105 Cal.Rptr.2d 905].)

Section 331 provides: "When any person has applied to the social worker, pursuant to Section 329, to commence juvenile court proceedings and the social worker fails to file a petition within three weeks after the application, the person may, within one month after making the application, apply to the juvenile court to review the decision of the social worker, and the court may either affirm the decision of the social worker *or order him or her to commence juvenile court proceedings.*" (Italics added.)

■ The Agency's suggested interpretation of the statute conflicts with its plain language. "In ordinary statutory usage a proceeding is commenced by the filing of a petition or complaint. . . ." (*People v. Marchman* (2006) 145 Cal.App.4th 79, 88 [51 Cal.Rptr.3d 369].) Consistent with that ordinary understanding, section 325 provides: "A *proceeding* in the juvenile court to declare a child to be a dependent child of the court *is commenced by the filing with the court, by the social worker, of a petition*, in conformity with the requirements of this article." (Italics added.)

*People v. Karriker* (2007) 149 Cal.App.4th 763 [57 Cal.Rptr.3d 412] (*Karriker*) does not support the Agency's argument that section 331's phrase "commence juvenile court proceedings" means something other than the filing of a dependency petition. In *Karriker*, the Sonoma County Public Conservator appealed an order, entered in criminal proceedings, that directed her to file a petition to establish a conservatorship under the Lanterman-Petris-Short Act (LPS Act; § 5000 et seq.) for an incompetent defendant. (*Karriker, supra*, 149 Cal.App.4th at pp. 770, 772.)

In its review of the governing statutes, Division Three of this court observed that section 5352.5 provided: " '[C]onservatorship proceedings *may be initiated* for any person committed to a state hospital . . . pursuant to Section . . . 1370 of the Penal Code . . . *upon recommendation* of the medical

director of the state hospital . . . *to the conservatorship investigator* of the county of residence of the person prior to his or her admission to the hospital.' " (*Karriker, supra,* 149 Cal.App.4th at p. 777, italics added.) Penal Code, section 1370, subdivision (c)(2), also provided, in relevant part: " 'Whenever any defendant is returned to the court pursuant to paragraph (1) or (2) of subdivision (b) or paragraph (1) of this subdivision and it appears to the court that the defendant is gravely disabled, as defined in subparagraph (B) of paragraph (1) of subdivision (h) of Section 5008 . . . , the court shall order the conservatorship investigator of the county of commitment of the defendant *to initiate conservatorship proceedings* for the defendant *pursuant to Chapter 3 (commencing with Section 5350) of Part 1 of Division 5 . . . .' "* (*Karriker,* at p. 777, fn. 5, italics added.) The question on appeal was whether Penal Code section 1370, subdivision (c)(2), authorized the court only to refer a matter for investigation or whether it authorized the court to order the conservator to file a conservatorship petition. (*Karriker,* at p. 782.)

The court noted that " '[i]n ordinary statutory usage a proceeding is commenced by the filing of a petition or complaint' (*People v. Marchman*[, *supra,*] 145 Cal.App.4th [at p.] 88 . . .) . . . ." (*Karriker, supra,* 149 Cal.App.4th at p. 782.) However, under chapter 3 of the LPS Act, which was specifically referenced in Penal Code section 1370, "proceedings are initiated when an authorized person recommends a conservatorship and the conservatorship investigator conducts an investigation to determine whether an LPS conservatorship is justified." (*Karriker,* at pp. 782–783, citing § 5352.5.) The court observed: "We see no reason to distinguish between the 'initiation' of conservatorship proceedings as that term is used in the LPS Act itself and the initiation of proceedings under the Act to which reference is made in Penal Code section 1370. The provisions in both codes cross-reference each other and were obviously intended to be applied in a consistent manner." (*Karriker,* at p. 783.) Accordingly, the court was only authorized to refer the matter for a conservatorship investigation and could not order the conservator to file a petition if it was determined the requirements for a conservatorship were not met. (*Id.* at pp. 770, 789.)

██ *Karriker* does not aid us in resolving the question presented by the Agency. The *Karriker* court construed only the statutes at issue in that case—a scheme in which "initiat[ion] of conservatorship proceedings" clearly meant investigation by the conservatorship investigator. (See *Karriker, supra,* 149 Cal.App.4th at p. 777.) Contrary to the Agency's assertion, the statutory scheme at issue in this case is not "remarkably similar." Here, the plain language of both sections 325 and 331 makes clear that "commencement of juvenile court proceedings" means the filing of a dependency petition.

██ Finally, sections 329 and 331 make clear that the social worker must have already conducted an investigation and have declined to commence

dependency proceedings *before* section 331 is invoked. We cannot construe section 331 as only allowing the juvenile court to order yet another investigation by the social worker. "An interpretation that renders statutory language a nullity is obviously to be avoided. [Citation.]" (*Williams v. Superior Court* (1993) 5 Cal.4th 337, 357 [19 Cal.Rptr.2d 882, 852 P.2d 377].)

Section 331, by its clear terms, authorizes the juvenile court to independently review the social worker's decision not to file and either affirm that decision or order the social worker to file a dependency petition. Our conclusion is consistent with the Fourth District Court of Appeal's observation, in *Allen M. v. Superior Court* (1992) 6 Cal.App.4th 1069 [8 Cal.Rptr.2d 259], that section 331 is an exception to the social worker's discretion to decide whether *to file* a dependency petition. (6 Cal.App.4th at pp. 1073, fn. 7, 1074–1075 [holding DSS (State Department of Social Services) does not have absolute right to dismiss dependency petition over minor's objection]; see also Cal. Rules of Court, rule 5.520(a) ["[*e*]*xcept as provided in sections 331* and 364, . . . the social worker . . . has the sole discretion to determine whether to file a petition under section 300 . . ." (italics added)].) The juvenile court did not exceed its statutory authority in making the October 7 Order. We must therefore address the separation of powers question.

### 2. *Separation of Powers Analysis*

The Agency contends: "[T]o the extent section 331 empowers the juvenile court to order the Agency to perform a quintessentially executive act—the filing of a petition—the statute thrusts the court into the performance of a *core* executive function. The court's order in this case usurps the Agency's *exclusive executive authority*, to wit, it's [*sic*] discretionary power to decide whether to file a petition to initiate dependency proceedings to protect an abused or neglected child." (Italics added.)

The problem with the Agency's argument is that it assumes that it has been vested with the exclusive authority to decide whether to initiate dependency proceedings. The Agency has not directed us to any section of the California Constitution or the Welfare and Institutions Code that provides it with such exclusive power. In fact, sections 329 and 331 make clear that the Agency does not have sole discretion in this area.

We have located only a few published decisions addressing whether a juvenile court has unconstitutionally usurped a power of the executive branch in the dependency context. *In re Z.C.* (2009) 178 Cal.App.4th 1271 [101 Cal.Rptr.3d 49] (*Z.C.*), *In re Ashley M.* (2003) 114 Cal.App.4th 1 [7 Cal.Rptr.3d 237]

(*Ashley M.*), and *Alliance for Children's Rights v. Los Angeles County Dept. of Children and Family Services* (2002) 95 Cal.App.4th 1129 [116 Cal.Rptr.2d 288] (*Alliance*) provide actual guidance.[15]

In *Z.C.*, Division Two of this court considered a challenge by the Alameda County Social Services Agency to the juvenile court's order requiring the provision of reunification services to a minor and her legal guardian. (*Z.C., supra*, 178 Cal.App.4th at p. 1275.) The agency argued that the juvenile court was limited to recommending the provision of services in such a situation. (*Id.* at p. 1276.) Division Two concluded that the governing statute "plainly provides the juvenile court with the authority to determine whether the legal guardianship should be maintained and whether it would be in the child's best interest to maintain the legal guardianship with reunification services." (*Id.* at pp. 1277, 1280.) The *Z.C.* court rejected the agency's separation of powers argument. (*Id.* at pp. 1286–1288.)

In *Ashley M.*, we considered whether the juvenile court exceeded its authority by directing that a particular social worker be assigned to a case. (*Ashley M., supra*, 114 Cal.App.4th at p. 4.) We concluded: "[I]n compelling the participation of a particular social worker the juvenile court exceeded its authority. As a matter of public policy and under the doctrine of separation of powers, designation of the social worker to perform the tasks of the social services agency must be left to the discretion and expertise of the [agency's] director." (*Id.* at p. 10.) Our decision rested on the fact that the juvenile court had no statutory power to designate a particular social worker to a case. (*Id.* at pp. 8–9 & fn. 4.) In fact, the Legislature had, by statute, given internal management authority solely to the county's director of social services. Accordingly, we concluded: "The determination of how best to assign duties to employees and otherwise allocate the agency's resources is not a judicial function and must be left to the agency's own discretion." (*Id.* at p. 9.)

---

[15] In contrast, M.C.'s citation to *Marvin F. v. Superior Court* (1977) 75 Cal.App.3d 281 [142 Cal.Rptr. 78] (*Marvin F.*), which deals with delinquency proceedings, is not particularly helpful. In *Marvin F.*, the court concluded that an agreement between the Alameda County Probation Department and the district attorney which operated to eliminate the independent exercise of discretion by the probation department in determining whether to commence juvenile delinquency proceedings (§ 602), was contrary to the statutory scheme contemplated by sections 650 through 655. (*Marvin F.*, at pp. 284–285, 290.) The court also rejected an argument that the statutory scheme violated the separation of powers. In *Marvin F.*, the minor contended that the statutory scheme was unconstitutional because "the discretion of the prosecuting attorney (an executive officer) [was] limited by the necessity that the probation officer (a judicial official) 'concurs' by the forwarding of the affidavit." (*Id.* at p. 290.) The court observed: "The procedure by which discretion becomes vested in the prosecuting attorney so that it may be exercised would not seem constitutionally compelled. In any event, the right to appeal to the prosecuting attorney means that the 'accord' of the probation officer is not required." (*Ibid.*)

*Alliance* involved DSS regulations requiring social workers to visit each dependent child monthly, unless certain exceptions were established. (*Alliance, supra,* 95 Cal.App.4th at pp. 1132, 1142.) A children's advocacy group petitioned the juvenile court, challenging the practice of the county department of child and family services of granting waivers from the monthly visitation requirement. Specifically, the group sought a special order prohibiting the use of visitation waivers by the department. (*Id.* at pp. 1132–1133.) The juvenile court refused to issue such a prohibition, but did issue an order that required the social worker to submit each waiver to the judicial officer overseeing a dependency case to determine whether a waiver is in the best interest of the particular child. (*Id.* at pp. 1132, 1138, 1142.) The department appealed, arguing the ruling violated the separation of powers doctrine because it imposed judicial review on decisions properly made exclusively by the department. (*Id.* at pp. 1132, 1142.) The Second District Court of Appeal affirmed, noting that "[o]nce a child becomes a dependent ward, 'the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child . . . .' (§ 362, subd. (a).)" (*Alliance, supra,* at pp. 1141, 1143.) The department conceded that the juvenile court is empowered and obligated to review the frequency and adequacy of visitation as part of its ongoing supervision of a dependent child. (*Id.* at pp. 1137, 1143.) The court concluded that the juvenile court's order did not violate the separation of powers or "improperly divest [the department] of its discretionary role in the waiver process." (*Id.* at p. 1143.) The court emphasized: "The trial court's order does not affect [the department's] decision whether a waiver is appropriate in particular cases. The order does not prevent [the department] from using waivers in general. The order retains [the department's] discretion to initiate and study whether a waiver is appropriate in an individual case. . . . The only additional step contemplated by the order is court review before, rather than after, less frequent visitation is put in place." (*Id.* at pp. 1142–1143.)

In *Ashley M.,* we discussed the unique division of responsibilities in the juvenile court system. (*Ashley M., supra,* 114 Cal.App.4th at pp. 6–8.) Specifically, we stated: "The county's social services agency plays a 'hybrid' role in dependency proceedings, exercising both executive and judicial functions. (See [*Danielle W., supra,*] 207 Cal.App.3d [at p.] 1238 . . . .) 'The juvenile law system envisions a cooperative effort between the [social services agency] and the juvenile court.' (*Id.* at p. 1234.) The social services agency has the initial responsibility to investigate allegations of abuse or neglect and has authority to take temporary custody of an abused or neglected child. (§ 306.) *But the agency must account to the court* on the reasons for removing the child from home and on the services available to facilitate the child's return. (§ 319.) When, at the disposition hearing, the court decides to keep the child out of parental custody, the court must (with exceptions) order

the social services agency to provide child welfare services to the parents and the child with the aim of reuniting the family. (§§ 300.2, 361.5, subd. (a).)

"In providing child welfare services, the county's social services agency acts as an administrative agency of the executive branch, subject to supervision by [DSS]. (§§ 202.5, 10000, 10051, 10800, 16500, 16500.1, 16501; *Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 143–144 [32 Cal.Rptr.2d 643]; [*Danielle W.*], *supra*, 207 Cal.App.3d at pp. 1235–1236, fn. 6.) *The juvenile court maintains ultimate control* over the delivery of services through its authority to decide that the services offered or provided to the parents were unreasonable and that further services must be offered by the social services agency. (§§ 366, subd. (a)(1)(B), 366.21, subds. (e), (f), 366.22, subd. (a), 366.26, subd. (c)(2); see *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1213–1215 [31 Cal.Rptr.2d 75].)

"In addition to providing child welfare services to the family involved in a dependency proceeding, the county's social services agency provides essential information to the court. At each stage of the dependency proceeding, the social services agency is statutorily mandated to prepare social study reports and make recommendations to assist the court. (§§ 280, 281, 319, subd. (b), 358, subd. (b), 358.1, 361.5, subd. (c), 364, 365, 366.21, subds. (c), (e), (f), 366.22, subd. (a), 366.26, subd. (b).) In this role, the social services agency acts as an impartial arm of the court in assisting the court to carry out the Juvenile Court Law. [Citations.]" (*Ashley M., supra*, 114 Cal.App.4th at pp. 7–8, italics added, fn. omitted.)

We also observed, in a footnote: "The social services agency . . . serves an executive function when it acts as the prosecuting arm of the state and initiates a juvenile dependency proceeding. (§§ 309, 311, 325; see *Alicia T. v. County of Los Angeles* (1990) 222 Cal.App.3d 869, 880–881 [271 Cal.Rptr. 513]; *In re Danielle W., supra*, 207 Cal.App.3d at p. 1238.) The same is true during the course of the dependency proceeding, in which the social services agency bears the burden of proof. (§§ 319, 350, subd. (c), 355, 366.21, subds. (e), (f), 366.22, subd. (a), 366.26, subd. (c)(1).)" (*Ashley M., supra*, 114 Cal.App.4th at p. 7, fn. 3.)

These cases make clear that the scope of the juvenile court's and the social service agency's authority in the "cooperative effort" is defined by the juvenile dependency statutes themselves. The Agency's reliance on *Ashley M.* is misplaced because the juvenile court has specifically been authorized by statute to review the Agency's decision not to file a dependency petition on behalf of a particular minor. (See §§ 329, 331.) In *Ashley M.*, no statute gave the juvenile court the authority to designate a particular social worker. (*Ashley M., supra*, 114 Cal.App.4th at pp. 8–9.) While we characterized the

role of a social services agency in initiating a juvenile dependency proceeding as an "executive function" (*id.* at p. 7, fn. 3), the power to initiate juvenile court proceedings was not at issue in *Ashley M.*, and we did not, in any event, intend to suggest that the juvenile court could not constitutionally supervise the agency's exercise of that function, pursuant to section 331.[16] In fact, we noted that the juvenile court maintains "ultimate control" over the social services agency's delivery of reunification services, which we also deemed an executive function. (*Ashley M.*, at pp. 7, 9.)

The instant case is more analogous to *Z.C.* and *Alliance*. As in *Z.C.* and *Alliance*, it is clear here that the juvenile court has statutory authority to review the social worker's decision to decline to initiate dependency proceedings. (See § 331; *Z.C., supra,* 178 Cal.App.4th at pp. 1287–1288; *Alliance, supra,* 95 Cal.App.4th at pp. 1141, 1143.) Furthermore, like the order at issue in *Alliance*, section 331 does not strip the Agency of its exclusive authority to make an initial determination of whether dependency proceedings are appropriate in an individual case. (§§ 290.1, 301, 306, 309, 311, 328, 329; *Alliance, supra,* 95 Cal.App.4th at p. 1142.) Section 331 merely provides that, in a subset of those cases in which the Agency decides *not* to initiate proceedings or undertake informal supervision, the court will subject the social worker's determination to review.[17] The Agency does not persuasively explain why judicial review consistent with the dependency statutes was legitimate in *Alliance* but unconstitutional in this case.

---

[16] The footnote on which the Agency relies does not even mention sections 329 and 331. (*Ashley M., supra,* 114 Cal.App.4th at p. 7, fn. 3.) Instead, we relied on *Alicia T. v. County of Los Angeles, supra,* 222 Cal.App.3d at pages 880–881 and *Danielle W., supra,* 207 Cal.App.3d at page 1238. The *Alicia T.* court did state: " 'Although child services workers do not initiate criminal proceedings, their responsibility for bringing dependency proceedings, and their responsibility to exercise independent judgment in determining when to bring such proceedings, is not very different from the responsibility of a criminal prosecutor. The social worker must make a quick decision based on perhaps incomplete information as to whether to commence investigations and initiate proceedings against parents who may have abused their children. The social worker's independence, like that of a prosecutor, would be compromised were the social worker constantly in fear that a mistake could result in a time-consuming and financially devastating civil suit.' " (*Alicia T., supra,* 222 Cal.App.3d at p. 880; see also *Meyers v. Contra Costa County Dept. of Social Services* (9th Cir. 1987) 812 F.2d 1154, 1157.) *Danielle W.* provides: "The parole officer or Department is charged with the burden of representing the state in seeking the best interests of the child. To the extent that its role may become adverse to the parent's interests, it of course must take care not to abuse its limited authority. As administrator of the court's order, the parole officer or Department is subject to the supervision of the juvenile court which provides the parent with the required due process. The law demands no more nor less under this hybrid responsibility." (*Danielle W., supra,* 207 Cal.App.3d at p. 1238.) Nothing in *Alicia T.* or *Danielle W.* is inconsistent with our conclusion in this case.

[17] Counsel for M.C. conceded, at oral argument, that a section 331 petition cannot be filed to challenge a social worker's decision to undertake informal supervision of a child, pursuant to section 301, in lieu of filing a dependency petition.

Attempts to analogize to the decision to initiate a criminal prosecution are inapt. The Agency relies on cases like *People v. Municipal Court* (1972) 27 Cal.App.3d 193, 206 [103 Cal.Rptr. 645] (*Pellegrino*), in which the Second District Court of Appeal barred a trial court from accepting criminal charges instituted by private citizens without the approval of the district attorney. The California Constitution expressly provides that law enforcement and the prosecution of crimes are core executive branch functions. (Cal. Const., art. V, § 13;[18] Cal. Const., former art. VI, § 20 ["[t]he style of all process shall be 'The people of the State of California,' and all prosecutions shall be conducted in their name and by their authority"]; see Gov. Code, § 100, subd. (b).) The governing statutes also make clear that the criminal prosecutor's charging decision is an exclusively executive function. (Gov. Code,. §§ 100, subd. (b), 26500, 26501.) It is this constitutional and statutory framework that has led courts to recognize that the separation of powers doctrine forbids judicial interference with the prosecutor's charging discretion. (See *Pellegrino, supra*, 27 Cal.App.3d at pp. 200, 204; *People v. Mikhail* (1993) 13 Cal.App.4th 846, 854 [16 Cal.Rptr.2d 641]; *People v. Smith* (1975) 53 Cal.App.3d 655, 660 [126 Cal.Rptr. 195] ["court acted beyond its authority in accepting a plea of guilty to a lesser nonincluded but related offense over the prosecutor's objection"].) There is no similar constitutional or statutory support for the Agency's position in this case.

 Furthermore, juvenile dependency proceedings are not criminal proceedings. (See *In re Malinda S.* (1990) 51 Cal.3d 368, 381 [272 Cal.Rptr. 787, 795 P.2d 1244], superseded by statute on another ground as stated in *In re Lucero L.* (2000) 22 Cal.4th 1227, 1240–1242 [96 Cal.Rptr.2d 56, 998 P.2d 1019].) The purpose of a dependency proceeding is to protect the child, rather than prosecute the parent. (*In re Malinda S.*, at pp. 384–385; *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397 [58 Cal.Rptr.2d 494]; § 300.2.) In light of the state's strong *parens patriae* interest in preserving and promoting the welfare of the child (*In re Sade C.* (1996) 13 Cal.4th 952, 989 [55 Cal.Rptr.2d 771, 920 P.2d 716]), we can understand why the Legislature chose to give the

[18] Article V, section 13 of the California Constitution provides: "Subject to the powers and duties of the Governor, the Attorney General shall be the chief law officer of the State. It shall be the duty of the Attorney General to see that the laws of the State are uniformly and adequately enforced. The Attorney General shall have direct supervision over every district attorney and sheriff and over such other law enforcement officers as may be designated by law, in all matters pertaining to the duties of their respective offices, and may require any of said officers to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions as to the Attorney General may seem advisable. Whenever in the opinion of the Attorney General any law of the State is not being adequately enforced in any county, it shall be the duty of the Attorney General to prosecute any violations of law of which the superior court shall have jurisdiction, and in such cases the Attorney General shall have all the powers of a district attorney. When required by the public interest or directed by the Governor, the Attorney General shall assist any district attorney in the discharge of the duties of that office."

juvenile court authority to review a decision not to initiate dependency proceedings. The statutory scheme simply provides some additional measure of protection to ensure an abused or neglected child does not slip through the cracks. In fact, the Legislature appears to have clearly distinguished the decision to initiate juvenile delinquency proceedings for criminal offenses, under section 602, from the decision to initiate wardship proceedings, under section 601, for minors beyond the control of parents or habitual truants.[19] Under section 655, the former decision is subject to the prosecuting attorney's ultimate control while the latter decision is subject to judicial review. (Compare § 655, subd. (a) with § 655, subd. (b).)[20]

As we have noted, the Agency and its amicus curiae cite only dicta in cases not considering sections 329 and 331 to suggest that the decision to file a dependency petition is an exclusively executive function. And we cannot agree that, under section 331, the juvenile court is asked to perform an inherently nonjudicial function. Rather, under section 331, the juvenile court adjudicates a controversy. Whoever filed the affidavit pursuant to section 329 will initiate the section 331 proceeding before the juvenile court. The juvenile court must receive and consider not only the section 329 affidavit, but also the social worker's endorsement stating the reasons why he or she declined to proceed. (§§ 329, 331.) The court may also consider additional evidence in the form of investigative reports by the social worker, declarations, and, if necessary, witness testimony. Upon receipt of this evidence, the court makes an independent assessment of whether "there was or is within the county, or

---

[19] "Any person under the age of 18 years who persistently or habitually refuses to obey the reasonable and proper orders or directions of his or her parents, guardian, or custodian, or who is beyond the control of that person, or who is under the age of 18 years when he or she violated any ordinance of any city or county of this state establishing a curfew based solely on age is within the jurisdiction of the juvenile court which may adjudge the minor to be a ward of the court." (§ 601, subd. (a).)

[20] Section 655, subdivision (a) provides, "When any person has applied to the probation officer, pursuant to Section 653, to request commencement of juvenile court proceedings to declare a minor a ward of the court under Section 602 and the probation officer does not cause the affidavit to be taken to the prosecuting attorney pursuant to Section 653 within 21 court days after such application, the applicant may, within 10 court days after receiving notice of the probation officer's decision not to file a petition, apply to the prosecuting attorney to review the decision of the probation officer, and *the prosecuting attorney may either affirm the decision of the probation officer or commence juvenile court proceedings.*" (Italics added.) Subdivision (b) of the same section states that "When any person has applied to the probation officer or the district attorney, pursuant to Section 653, to commence juvenile court proceedings to declare a minor a dependent child of the court or a ward of the court under Section 601 and the probation officer or district attorney fails to file a petition within 21 court days after making such application, the applicant may, within 10 court days after receiving notice of the probation officer's or district attorney's decision not to file a petition, apply to the juvenile court to review the decision of the probation officer or district attorney, and *the court may either affirm the decision of the probation officer or district attorney or order him or her to commence juvenile court proceedings.*" (Italics added.)

residing therein, a child within the provisions of Section 300 . . . ."[21] (§§ 329, 331.) This is similar to the role the juvenile court plays at the detention and jurisdiction hearings. (§§ 319, subd. (b) ["[t]he court shall order the release of the child from custody unless a prima facie showing has been made that the child comes within Section 300 . . ."], 355, subd. (a) ["[a]t the jurisdictional hearing, the court shall first consider only the question whether [proof by a preponderance of evidence shows] the minor is a person described by Section 300"].)

 We do not intend to suggest, however, that an applicant under section 331 need only present a prima facie showing of dependency jurisdiction. While such a showing is a necessary predicate, the court's independent review of the evidence should also give due consideration to the social worker's determination and the court may properly rely upon the agency's expertise for guidance. (See *In re Miguel E.* (2004) 120 Cal.App.4th 521, 548 [15 Cal.Rptr.3d 530]; *In re Robert A.* (1992) 4 Cal.App.4th 174, 189 [5 Cal.Rptr.2d 438].) Ultimately, the juvenile court must exercise its own discretion to determine whether the child comes within section 300 and whether the filing of a dependency petition is necessary for the child's welfare.[22] (See *Allen M., supra,* 6 Cal.App.4th at p. 1074 ["[a]lthough the

---

[21] We are not persuaded that the juvenile court is limited to determining whether a social services agency abused its discretion in deciding not to file a dependency petition. Section 331 does not provide any support for the argument. Neither do the opinions on which the Agency relies, all of which involved instances when the social services agency had been provided, by statute, with the sole authority to make a particular determination. (See *In re Esperanza C., supra,* 165 Cal.App.4th at pp. 1055–1056, 1060 ["[abuse of discretion] review of the criminal records exemption process does not impinge the agency's *exclusive* authority to grant or deny a criminal records exemption" (italics added)]; *In re Hanna S.* (2004) 118 Cal.App.4th 1087, 1092 [13 Cal.Rptr.3d 338] ["once a child has been freed for adoption, the juvenile court's powers are limited to reviewing whether the [a]gency has abused its discretion in placing the child"]; *In re Harry N.* (2001) 93 Cal.App.4th 1378, 1397 [114 Cal.Rptr.2d 46] ["absent an abuse of discretion, the Legislature has given the power to [DSS], not the court, to decide where a child should be placed after parental rights are terminated and pending adoption"]; *Los Angeles County Dept. of Children & Fam. Services v. Superior Court* (2001) 87 Cal.App.4th 1161, 1167–1168 [105 Cal.Rptr.2d 254] [social service agency's decision to not request criminal conviction placement waiver reviewed for abuse of discretion]; *Department of Social Services v. Superior Court* (1997) 58 Cal.App.4th 721, 724, 732–734 [68 Cal.Rptr.2d 239] [juvenile court may review agency's placement decision, after termination of parental rights, for abuse of discretion but may not substitute its judgment for agency's]; *Los Angeles County Dept. of Children etc. Services v. Superior Court* (1998) 62 Cal.App.4th 1, 10 [72 Cal.Rptr.2d 369] ["[t]his does not mean the court may substitute its independent judgment for that of DSS because the Legislature has given the agency exclusive custody and control of the minor and the discretion to make placement decisions"].)

[22] The court should consider the same factors relevant to the social worker's initial decision. California Rules of Court, rule 5.516(c) provides: "In determining whether to file a petition under section 300 or 601 or to request the prosecuting attorney to file a petition under section 602, the social worker or probation officer must consider: [¶] (1) Whether any of the statutory criteria listed in rules 5.770 and 5.772 relating to the fitness of the child are present; [¶]

court may accord great deference to the Department's expertise [when the Department wishes to dismiss a petition over objection], the primary focus of the court is the determination of whether dismissal is in the interests of justice and the welfare of the minor"].) The court may either affirm the social worker's decision or order the social worker to file a dependency petition.[23]

■ In conclusion, we fail to see how the judiciary can "usurp" a power never exclusively vested in the executive branch. We find nothing in our Constitution or the statutory dependency scheme that would classify initiation of dependency proceedings as a "core" or "essential" executive function. Nor do we see how the limited judicial review provided by section 331 would "defeat or materially impair" the executive authority which is vested in the Agency.[24] (See *People v. Bunn, supra*, 27 Cal.4th at p. 14; *Carmel Valley Fire Protection Dist., supra*, 25 Cal.4th at p. 305.)

■ We hold that section 331 does not violate article III, section 3, of the California Constitution. The juvenile court did not violate the separation of powers doctrine when it ordered the Agency to file a dependency petition on M.C.'s behalf.[25]

---

(2) Whether the alleged conduct would be a felony; [¶] (3) Whether the alleged conduct involved physical harm or the threat of physical harm to person or property; [¶] (4) If the alleged condition or conduct is not serious, whether the child has had serious problems in the home, school, or community that indicate that formal court action is desirable; [¶] (5) If the alleged condition or conduct is not serious, whether the child is already a ward or dependent of the court; [¶] (6) Whether the alleged condition or conduct involves a threat to the physical or emotional health of the child; [¶] (7) Whether a chronic, serious family problem exists after other efforts to resolve the problem have been made; [¶] (8) Whether the alleged condition or conduct is in dispute and, if proven, whether court-ordered disposition appears desirable; [¶] (9) The attitudes of the child and the parent or guardian; [¶] (10) The age, maturity, and capabilities of the child; [¶] (11) Whether the child is on probation or parole; [¶] (12) The recommendation, if any, of the referring party or agency; [¶] (13) The attitudes of affected persons; [¶] (14) Whether any other referrals or petitions are pending; and [¶] (15) Any other circumstances that indicate that the filing of a petition is necessary to promote the welfare of the child or to protect the public."

[23] Neither side discusses the appropriate standard for appellate review of the juvenile court's section 331 determination. Since the issue is not before us, we do not decide.

[24] The Agency and amicus curiae CSAC argue that a court order under section 331 directing that a dependency petition be filed places a burden on executive branch resources in providing social services and in pursuing matters believed to lack merit. That argument is one that must be addressed to the Legislature. In reviewing statutes enacted by the Legislature, we "may not undertake to evaluate the wisdom of the policies embodied in such legislation." (*Superior Court v. County of Mendocino, supra*, 13 Cal.4th at p. 53.)

[25] The Children's amici curiae brief points out that the statutes of numerous other states allow a private party to either directly file a dependency petition or seek review of the child welfare agency's decision not to file. (See, e.g., Ariz. Rev. Stat. § 8-841; Ark. Code Ann. § 9-27-310; Colo. Rev. Stat. § 19-3-501; Conn. Gen. Stat. § 46b-129; Del. Code Ann. tit. 10,

C.–F.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The juvenile court's orders are affirmed.

Simons, Acting P. J., and Needham, J., concurred.

---

§ 1003; Fla. Stat. § 39.501; 705 Ill. Comp. Stat. 405/2-13; Kan. Stat. Ann. § 38-2233; Ky. Rev. Stat. Ann. § 620.070; Me. Rev. Stat. tit. 22, § 4032; Md. Code Ann., Cts. & Jud. Proc. § 3-809; Mass. Gen. Laws ch. 119, § 24; Mich. Comp. Laws § 712A.11; Minn. Stat. § 260C.141; Mo. Rev. Stat. § 211.081; N.D. Cent. Code § 27-20-20; N.H. Rev. Stat. Ann. § 169-C:7; N.J. Stat. Ann. § 9:6-8.34; N.Y. Fam. Ct. Act § 1032; Ohio Rev. Code Ann. § 2151.27; Or. Rev. Stat. § 419B.809; 42 Pa. Cons. Stat. § 6334; R.I. Gen. Laws § 14-1-11; Tenn. Code Ann. § 37-1-119; Utah Code Ann. § 78A-6-304; W.Va. Code § 49-6-1; Wis. Stat. § 48.25.) Our conclusion is consistent with the out-of-state decisions that have considered separation of powers challenges to such statutes. (See, e.g., *People ex rel. Davis v. Vasquez* (1982) 92 Ill.2d 132 [65 Ill.Dec. 262, 441 N.E.2d 54, 61–62]; *Sullivan v. Sullivan* (1982) 110 Ill.App.3d 714 [66 Ill.Dec. 435, 442 N.E.2d 1348, 1352].)

*See footnote, *ante*, page 784.