Filed 11/7/13  In re M.B. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re M. B., a Person Coming Under the Juvenile Court Law. | |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>K. B.,<br><br>　　　　Defendant and Appellant. | C073071<br><br>(Super. Ct. No. JD232052) |

　　　　K. B., the mother of 13-year-old M. B., appeals from an order of the Sacramento County Juvenile Court granting a request to change a court order filed by the Sacramento County Department of Health and Human Services (department).  (Welf. & Inst. Code,[1] §§ 388, 395.)  The order removed M. B. from mother's custody, placed her in her father's

---

[1]　　　Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

custody under dependent supervision, and granted mother regular visitation as frequent as is consistent with the well-being of M. B.

Mother appeals contending the visitation order, as orally pronounced by the juvenile court, erroneously delegated to M. B. discretion to determine whether any visitation would occur. Mother claims this is so even though the formal written order expressly provides that "the child shall not be given the option to consent to, or refuse, future visits." Mother argues her claim is cognizable notwithstanding her failure to raise it in the juvenile court.

The department responds that the appeal is moot , mother forfeited her contention by failing to raise it in the juvenile court, and the court did not delegate its authority to the child. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Originating Circumstances*

The family has prior child welfare history including referrals for emotional, physical, and sexual abuse. With the exception of a substantiated physical abuse allegation against mother in 2007, the allegations were deemed "inconclusive" or "unfounded."

On December 15, 2011, the department received a referral alleging that M. B. and her sibling H. B., who had been in father's care pursuant to a department safety plan, were facing an "unsafe situation" because the family law court awarded mother sole custody of the children.[2]

The next day, the department social worker conducted several interviews. A hospital social worker told her that mother had brought H. B. to the emergency department after H. B. attempted suicide. H. B. claimed she had swallowed more than

---

[2]     H. B., who is two years older than M. B., is not a party to this appeal.

100 pills and threw up most of them when she started feeling sick. H. B. had told the hospital social worker that she "would rather be dead than live with her mother," and that "she was going to commit suicide if she is made to go back to her mother's care."

H. B. told the department social worker that, after she took the pills, she was unable to stop throwing up. When she told mother what she had done, mother called her " 'stupid' " and slapped her face. H. B. had to beg mother to take her to the hospital.

Father told the department social worker that he "had full custody of the children as of June 2011 until it was changed in the Family Court on December 14, 2011. . . . The father added that his children were vulnerable as they suffered abuse by their mother and as a result were emotionally impacted." Father believed the children's mental health issues were directly linked to the abuse they endured from mother, and the medical professionals supported his belief.

The children's former therapist told the department social worker "that the children suffer from mental health issues, which they reported were triggered by their mother's abuse against them."

A school counselor told the department social worker that M. B. "was crying hysterically and screaming that she did not want to go with [] mother because [mother] was going to kill her." M. B. had been doing very well in school for the past six months or so and showed no fear of father, who was closely involved with M. B.'s school functions.

M. B. confirmed to the department social worker that she was "very scared" of mother and believed that mother "was going to kill her," because she "had a dream about it" and because "mother screams at her." M. B. said that mother " 'had moods [*sic*] swings and she would be abnormally happy and then sassy.' " Mother "would burst into tears and then be happy and then scream at us."

## *Petition*

On December 30, 2011, the department filed a petition alleging that M. B. came within the provisions of Welfare and Institutions Code section 300 in that she "is suffering and/or is at risk of suffering serious emotional damage as a result of the ongoing custody dispute between the parents." Since May 2010, the parents have made allegations of sexual abuse, physical abuse, and domestic violence against each other. M. B. has been diagnosed with posttraumatic stress disorder and is being treated for depression and anxiety. The parents' ongoing custody dispute places the child at further risk of suffering serious emotional damage.

## *Detention*

At the detention hearing on January 17, 2012, the juvenile court detained the children and placed them with the paternal grandmother.

## *Jurisdiction And Disposition*

On March 5, 2012, the department filed a jurisdiction/disposition report that went into great detail regarding the parents' toxic relationship. The report revealed father to be a controlling and manipulative person who was willing to submit false information in court proceedings.

In a February 3, 2012, interview, father's girlfriend reported that father describes himself as a " 'master manipulator' " and claims " 'No one is better at deceiving and manipulating' " than him. He boasted to her that he is " 'the smartest man alive' " and " 'a certified genius,' " in that he has "APSC disorder, in which the two halves of the brain work independently" and may be utilized "simultaneously and independently of each other," making him "more intelligent than anybody else."

Father's girlfriend witnessed inappropriate sexual activity between him and M. B. He rubbed her back and cupped her buttocks with his hand. She sat on his lap, with her buttocks over his genitals, and pressed her back against his chest. He caressed her buttocks for 15 to 20 seconds. She asked him, " 'Can I sleep with you, Dad?' "

4

Father's girlfriend also questioned his emotional relationship with the children. The children think father " 'walks on water' " and " 'they look at him as Christ.' " He told the girlfriend, " 'My girls know better than to say anything against me.' " Father admitted having unauthorized contact with the children at the paternal grandmother's house.

Three days after her interview, the girlfriend requested to withdraw her statements because she is afraid of father. Father had told her she " 'better not say anything that could damage' " his relationship with the girls. Father also told her, " 'You will regret ever knowing me. I will ruin you.' " The threats appeared to be credible because father admitted "he once drained the motor oil out of mother's car without her knowledge, and the car broke down while one of the children was in it with [] mother."

For her part, mother accepted responsibility for the emotional harm the children have suffered due to her delay in ending the abusive relationship with father. The detective who had investigated H. B.'s allegations of physical and sexual abuse found that mother's denial of the allegations was credible. The detective believed mother was a genuine victim of domestic violence.

Mother's employer reported that she is " 'wonderful' " with the autistic children she works with in her capacity as an instructional aide. Mother's therapist was of the opinion that she does not believe mother has abused the children and does not believe mother has any mental disorder.

Based on the evidence, the department assessed that father "has attempted to manipulate the children and keep them separated from the mother in that the father continued to make unfounded allegations against the mother, and he gave false or misleading information to mental health service providers in regard to the mother's mental health history. These efforts have had deleterious effects on the children, caused them extreme emotional distress resulting in the child, [H. B.], attempting suicide on

5

multiple occasions, and the child, [M. B.], suffering from Post Traumatic Stress Disorder."

At the jurisdiction hearing on March 14, 2012, the juvenile court sustained the section 300 petition. At the disposition hearing on April 11, 2012, the court adjudged the children dependents of the court.

On July 19, 2012, the children were removed from the paternal grandmother due to her inability to care for them.

*Six-Month Review*

At the six-month review hearing on September 26, 2012, the juvenile court ordered that M. B. be returned to her parents under continued dependency jurisdiction, with the goal of terminating jurisdiction. She was scheduled to reside separately with each parent on alternating weeks.

*Request To Change Court Order*

On November 15, 2012, mother telephoned the department social worker, who was not the author of the jurisdiction/disposition report, and reported that M. B. had something important to tell the worker about the incident in which father had drained the oil from mother's car. When the social worker met with M. B. and her therapist, M. B. claimed mother had asked M. B. to tell the social worker about the incident.[3] During the meeting, M. B. was crying, raising her voice, and rocking in her chair. She repeatedly claimed that she did not want to return home with mother. The social worker told mother there was an agreement that, if the children wanted to go to the other parent's home, they

---

[3]     In her informational memorandum, the social worker did not acknowledge that, per the jurisdiction/disposition report, an oil draining incident had occurred. Read in isolation, the memorandum can be read to suggest that mother solicited M. B. to voice a false report of a new incident.

6

would be allowed to do so. The social worker authorized M. B. to stay with father until she and the parents had a conjoint therapy session.

On December 28, 2012, the department social worker met with M. B., who refused to visit or talk with mother. Three days later, the social worker met with mother, who advised that the children are being manipulated by father. The social worker responded that M. B. had made no mention of father alienating her from mother. M. B. told her therapists and social workers that she is afraid to go home to mother because mother screams and yells at her.

On January 3, 2013, the department filed a request to change the court order that placed M. B. with both parents. (§ 388.) The department requested that she be placed in the sole care of father under dependent supervision.

At the hearing on January 30, 2013, mother's counsel objected to the department's motion, which counsel considered to be "essentially a change in custody status motion." Counsel requested that mother be granted legal custody, as well as 25 percent parenting time. She also requested conjoint therapy and visitation.

The juvenile court granted the department's motion. Mother's counsel did not object to the court's oral ruling.

DISCUSSION

I

*Scope Of Appeal*

Mother's notice of appeal states that she appeals from the "Section 388. Removal [of M. B.] from Mother's care." However, mother has not asserted error with respect to the removal or the ensuing placement of M. B. with father. Thus, those issues have been abandoned. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.)

We granted mother's request to construe her notice of appeal as appealing the findings and orders regarding visitation.

7

## II

### *Appealability*

The department contends the visitation order is an interim order and, as such, is not appealable and can be reviewed only on appeal from a final judgment. We disagree.

"Appeals in dependency proceedings are governed by section 395, which provides: 'A judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and *any subsequent order may be appealed as an order after judgment . . . .*' (§ 395, subd. (a)(1).)" (*In re M.C.* (2011) 199 Cal.App.4th 784, 801, italics added.) "In dependency cases, the dispositional order is generally the first appealable order. [Citations.]" (*Ibid.*)

In this case, the challenged order placing M. B. in father's custody and granting mother visitation was entered subsequent to the dispositional order. Thus, the challenged order is appealable as an order after judgment. (*In re M.C., supra,* 199 Cal.App.4th at p. 801.)

## III

### *Forfeiture*

Mother contends her counsel's failure to object to the visitation order in the juvenile court does not forfeit the issue on appeal because the order, made during the reunification period, raises "a legal issue of paramount importance." We disagree.

A party forfeits a claim that the juvenile court improperly delegated its visitation authority to a third party when he or she fails to object in the juvenile court. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 685-686; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221–222; *In re Anthony P.* (1995) 39 Cal.App.4th 635, 640-642.)

"[A]pplication of the forfeiture rule is not automatic. [Citations.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 961.) "But the appellate court's discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal

issue. [Citations.] Although an appellate court's discretion to consider forfeited claims extends to dependency cases [citations], the discretion must be exercised with special care in such matters. 'Dependency proceedings in the juvenile court are special proceedings with their own set of rules, governed, in general, by the Welfare and Institutions Code.' [Citation.] Because these proceedings involve the well-being of children, considerations such as permanency and stability are of paramount importance. [Citation.]" (*In re S.B.*, at p. 1293.)

*S.B.* held that a Court of Appeal majority did not abuse its discretion in entertaining a mother's challenge to a postreunification visitation order notwithstanding her failure to object to it in the juvenile court. "The appeal presented an important issue of law: whether a juvenile court in a dependency case may delegate to the child's legal guardian the authority to decide whether a parent may visit the child, a question that has divided the Courts of Appeal." (*In re S.B., supra,* 32 Cal.4th at pp. 1293-1294.)

Mother claims this case involves "a legal issue of paramount importance because the [visitation] order was made during the reunification period." But the mere timing of the order during reunification does not make the issue of paramount importance. It is settled that a parent's failure to challenge the reasonableness of reunification services in the juvenile court prevents a challenge to the reasonableness of services on appeal. (E.g., *In re Christina L.* (1992) 3 Cal.App.4th 404, 416.)

In this case, the juvenile court's written order properly granted mother regular visitation as frequent as is consistent with the well-being of M. B. Her only claim on appeal is that the court's oral remarks at the hearing should not be read as contradicting the written order. Thus, this case does not present the sort of important legal issue that was considered in *S.B.* We conclude mother has forfeited her appellate claim.

Having so concluded, we need not discuss the department's remaining contentions.

DISPOSITION

The January 2013 visitation order is affirmed.


                                                                   ROBIE     , J.


We concur:



        BLEASE     , Acting P. J.



        MAURO     , J.