Filed 5/14/14  In re S.T. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re S.T. et al., Persons Coming Under the Juvenile Court Law. | B250714 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK97678) |
| Plaintiff and Respondent, | |
| v. | |
| SHAUNA T., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Anthony Trendacosta, Judge.  Affirmed.

Sherman & Associates and Beatrice Fung for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Nvid Nakhjavani, Deputy County Counsel for Plaintiff and Respondent.

Mother Shauna T. challenges the sufficiency of the evidence to support jurisdiction and disposition orders in this dependency case involving her two children, S.T. and Lillie T.

We find sufficient evidence and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

Shauna T.'s husband, Todd T., died in 2011. They had two children, S.T., born in 2003, and Lillie T., born in 2005. On February 2, 2013, mother was participating in a relationship skills class at the Parenting and Relationship Counseling Foundation. She said she felt hopeless and wanted to commit suicide, then stated it would be better for her children to not go on living without another parent. The police responded when this statement was reported and placed mother on an involuntary psychiatric hold under Welfare and Institutions Code section 5150.[1] Mother and children were transported to the Los Angeles Police Department Devonshire Division.

Department of Children and Family Services (DCFS) children's social worker Jenny Huang went to the police station that afternoon. The detention report stated that CSW Huang spoke with Los Angeles police officer Williams.[2] According to the report, Officer Williams told Huang "mother continues to express suicidal and homicidal ideations." The report continues: "Furthermore mother has been rationalizing the ideations as kindness towards the children. She has made consistent statements to multiple people indicating the children are already suffering due to their father's death and it would be kinder to kill them so they would not have to suffer her death after she commits suicide."

Officer Williams provided CSW Huang with a document he was given by therapist Mylene Carberry of Parenting and Relationship Counseling Foundation dated

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Officer Williams's first name does not appear in the record.

February 2, 2013 concerning mother's suicidal and homicidal statements. According to CSW Huang, "Officer Williams states mother is very unpredictable and believes it would be in the children's best interest if mother was not aware of their location."

CSW Huang interviewed mother in a holding room at the police station with Officer Williams present. Mother said her group and individual therapy were not enough. The parenting group had only made her feel more inadequate as a parent. "She described herself as 'disorganized, forgetful and a wreck.'" She also said, "'I don't know how to do it [be a parent].'" Mother admitted that during the therapy session that day she said she wanted to kill herself and her children. Mother said that she did not understand why her statements led to DCFS involvement. She reported that both of her parents had mental health issues. Mother described financial stresses and being overwhelmed by coping with everyday issues.

S.T. was interviewed in private at the police station. He said he was "'sort of'" afraid of mother based on an analogy to characters in a movie he was watching at the station. He said mother was sometimes mean and sometimes nice. When mean, she yelled and raised her voice. He was scared when she was mean. S.T. said mother had told him that she wanted to give him away, which made him feel sad and angry. He reported that mother sometimes slept a lot, sleeping all day on Saturday, Sunday and Monday. At such times, a tenant who shares the home cared for the children. S.T. said that day (February 2) mother had told him, "'I feel so sad that I want to hurt myself.'" This was the first time she had said this, which made him feel sad and worried.

The minor Lillie also was interviewed by CSW Huang at the station. She felt safe with mother and enjoyed being with her. Mother still felt sad about father's death and cried a lot. She did not know whether mother had any suicidal or homicidal thoughts. Lillie reported that when she was six years old, mother hit her on her arm with a shampoo bottle. She said mother did not think this would hurt the child much, but it did. She did not sustain any injuries as a result. This was an isolated incident. She also reported that mother sometimes pulled her hair when Lillie did not want to get into bed, causing medium pain that would not last.

3

The detention report included an account of a telephone call received by CSW Huang at the police station from Dr. Faye Snyder, clinical director of the Parenting and Relationship Counseling Foundation. Dr. Snyder said that after she reported the incident at the therapy group, it was agreed that mother would tell S.T. that he would be staying with the maternal grandfather for a few days because mother "was going to a meeting." Instead, mother told S.T., "'I told the wrong people I wanted to kill myself and now they're taking me away.'" According to Dr. Snyder, mother was very high risk and required long term (at least six months) intensive mental health care. The detention report stated: "Dr. Snyder diagnosed mother to be Borderline Psychotic with Major Depression, Severe." She also said there was a concern that mother and father had a history of substance abuse.

The children were placed in foster care and mother was transported to Olive View Medical Center. At 9:00 on the night of February 2, 2013, CSW Huang spoke with Dr. Aguilar at Olive View. The detention report stated: "According to Dr. Aguilar, [mother] reported she wanted to express herself during group therapy today and stated she had been thinking about committing suicide but thought about killing the children first." Mother was kept on the psychiatric hold. Late the next day, CSW Huang received a voice mail from a different doctor at Olive View who said that mother had been discharged. "She assessed mother's statements to be purely hypothetical and philosophical in nature and does not feel like mother is at risk to herself or others. She reports mother is a dramatic person because she is an actress and a singer." Mother called shortly later to inquire about reuniting with the children. She was told that she would have to wait a short time until the detention hearing.

DCFS filed a petition alleging that the children came within section 300, subdivisions (a), (b), and in the case of S.T., subdivision (j). It was alleged that mother had physically abused Lillie, putting both children at risk of physical harm and that mother's emotional problems, including suicidal and homicidal ideation, placed the children at risk of harm. At the detention hearing the court ordered the children detained and a team decisionmaking meeting was ordered to be held within one week to develop

4

an appropriate safety plan for the children. DCFS was ordered to provide mother referrals for parenting, individual counseling, and anger management programs. The children were to be assessed for individual counseling. A multidisciplinary assessment of the family, including the children's physical and psychological status, also was ordered.

Before a team decisionmaking meeting could be held, mother spoke with personnel from DCFS and proposed that two adult non-relative extended family members, the B.'s (brother and sister) would move into mother's home to care for the children. Mother and her tenant would move out. Mr. B. would also bring his two children with him. Eventually the children were returned to their own home in the care of Mr. B and mother moved out.

DCFS filed a jurisdiction and disposition report for the hearing on April 2, 2013 prepared by dependency investigator Deanna Rene Ramos. Mother spoke with Ramos, although at times refused to provide information, saying she had been instructed not to do so by her attorney. She denied using physical discipline on the children or having hurt them. S.T. told Ramos that mother had hit Lillie over the head with an empty plastic shampoo bottle and Lillie cried. He said mother did not think the bottle would be as hard as it was. Mother generally disciplines him by taking things or privileges away. He recanted statements reported in the detention report, such as mother telling him she wanted to give him away, that mother cried all the time, and that mother slept all day on Saturday, Sunday, and Monday. Lillie told Ramos that she had been hit on the leg, not the head, by mother. She explained that mother did not mean to hurt her. Ramos believed Lillie was very guarded about her mother. Mother was visiting the children on a daily basis, and helped cook dinner. There were some strains with Mr. B. concerning scheduling of visits.

The Multidisciplinary Assessment Team (MAT) assessor, Mary Moulton, told Ramos that she had received a hysterical call from mother about visitation over the weekend, but concluded that most of the information provided by mother during their two-hour meeting was untrue. Mother told Moulton she had been instructed by her attorney not to provide anything to DCFS. In addition, Moulton raised concerns about

5

Dr. Snyder, the therapist who directs the program at which mother received therapy, and at which she made the statements which gave rise to the dependency case. Moulton said that the form of therapy practiced by Dr. Snyder was controversial. Moulton believed that mother had no boundaries with the children, who, unlike mother, had dealt with the father's death. Mother kept "dragging them back," not letting them get past the father's death. Moulton believed that mother needed therapy with a qualified therapist, but did not think she would hurt herself. Mother had not signed a release, so Moulton could not speak with the treating clinicians at Olive View.

DCFS recommended that the children be declared dependents and remain removed from mother's custody. It suggested mother receive family reunification services including parenting, individual counseling, a mental health/psychological assessment, and participation in a mental health treatment plan. It recommended that mother have a minimum of eight hours of monitored visitation weekly.

A contested jurisdiction/disposition hearing was held over several days. Mother, Dr. Faye Snyder, Mary Moulton, Deanna Rene Ramos, and Barbara Susan Lorimar (family friend) testified.

The MAT Summary of Findings Report was completed on April 25, 2013. The report noted that the family loved each other and wanted to be reunified as soon as possible. The family was demonstrative with one another and the children were well-adjusted. Mother had completed 12 hours of nurturing parent classes and three hours of anger management classes. Moulton concluded that mother had been negatively impacted by participation in the Parenting and Relationship Counseling Foundation program, which made mother question her abilities as a parent. The assessor concluded that S.T. did not need mental health services. He said he loved and missed his mother and wanted her to come home so the family could all be in one place again. Lillie was found to be very close to mother and missed having her home on a full time basis. She was not referred for mental health services. The assessor recommended family therapy for the entire family when they are reunited to "process" their separation.

6

The court found Snyder to be "incredibly incredible. I didn't believe pretty much anything she testified to on the witness stand." It observed that jurisdiction was not dependent on actual harm to the children, if there is risk. The court found: "There is no doubt in the court's mind that mother made the statements that are attributed to her. She doesn't really deny them per se. She just tries to put a—that, somehow or other, people go around every day threatening to kill themselves and their children in public and that's just a hypothetical. In 27 years of doing this, that's a first for me." The court did not doubt the close bond between mother and the children, but observed that it had seen children who had been abused who were bonded to those who put them at risk. The court mentioned the hair pulling and apparently the shampoo bottle throwing. It noted that DCFS had not interviewed the people who were present when mother made her suicidal and homicidal statements. But the statements were repeated to police officers and a doctor at the hospital.

The court sustained the petition under section 300, subdivision (a)(1) as amended, finding that on prior occasions, mother had inappropriately disciplined Lillie causing the child pain and suffering and placing both children at risk, and the related subdivision (j) allegation. The section 300, subdivision (b)(1) was stricken. The court sustained the section 300, subdivision (b)(2) count as amended based on mother's mental and emotional problems.

DCFS and counsel for the children asked the court to order the children to remain suitably placed with monitored visits and discretion to liberalize. They suggested therapy with a licensed therapist and a parenting class for mother. Counsel for mother argued the record demonstrated that mother had completed a parenting class. She argued that the children could be released to mother with conditions in place, such as unannounced visits. She asked for a team decision meeting to reassess the current placement.

The court found by clear and convincing evidence that the children were in substantial danger to their physical and emotional well-being if placed with mother, that reasonable efforts had been made to prevent removal, and that there were no reasonable means by which the children could be protected without removal. Their care, custody,

and control was placed with DCFS for suitable placement.  Reunification services were ordered.  If mother had completed parenting and anger management classes already, that was acceptable.  She was ordered to participate in individual counseling with a licensed therapist and conjoint counseling with the children when deemed appropriate.  The children were to be reassessed for individual counseling.  DCFS was ordered to convene a team decisionmaking meeting regarding the current placement, and to assess another relative or extended family member if the current caregiver could not continue.

Mother filed a timely appeal from the jurisdiction and disposition orders.  DCFS filed a motion asking us to take judicial notice of a January 29, 2014 order of the dependency court returning the children to custody of mother with family maintenance services.  We invited counsel to address whether this subsequent order rendered mother's appeal from the dispositional order moot.

**DISCUSSION**

Mother challenges the sufficiency of the evidence to support both the jurisdiction and disposition orders.

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."  [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]  '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'" [Citation.]"  (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)' [Citation.]"  (*In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).)

8

It is established that where multiple grounds for jurisdiction are alleged in a dependency petition, we may affirm a finding of jurisdiction if we find substantial evidence to support any one of the statutory bases alleged.  (*I.J.*, *supra*, 56 Cal.4th at p. 773.)  "In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]"  (*Ibid.*)

Hearsay statements cannot be used as the exclusive basis for finding jurisdiction under section 300.  (*In re Christian P.* (2012) 208 Cal.App.4th 437, 448.)  "'The question before us, then, is whether there was corroborating evidence in this record which could support the witnesses' hearsay statements sufficiently to sustain a jurisdictional finding.  Corroborating evidence is "[e]vidence supplementary to that already given and tending to strengthen or confirm it.  Additional evidence of a different character to the same point." [Citation.]  In this context, corroborating evidence is that which supports a logical and reasonable inference that the act described in the hearsay statement occurred.  [Citation.]' [Citation.]"  (*Ibid.*)

In the dependency context, "corroborative evidence, whether direct or circumstantial, (1) is sufficient if it tends to connect the allegedly offending parent with the alleged negligent act even though it is slight and "'entitled, when standing by itself, to but little consideration [citation], nor does it need to establish the precise facts'" in the hearsay statements; (2) is sufficient if it tends to connect the allegedly offending parent with the alleged negligent act and the parent's "'own statements and admissions, made in connection with other testimony, may afford corroboratory proof sufficient'" to find jurisdiction; (3) need not "'go so far as to establish by itself, and without the aid of the testimony of [the hearsay declarant], that the [allegedly offending parent] committed the [negligent act] charged'"; (4) may include the allegedly offending parent's "'own testimony and inferences therefrom, as well as the inferences from the circumstances surrounding the entire transaction'"; and (5) may consist of '[f]alse or misleading statements to authorities . . . or as part of circumstances supportive of corroboration.' [(*In re B.D.* (2007) 156 Cal.App.4th 975, 984–985.)]  "'[W]hether the corroborating

9

evidence is as compatible with innocence as it is with guilt is a question of weight for the trier of fact [citations].' [Citation.]" [Citation.]' (*Ibid.*)" (*Christian P.*, *supra*, 208 Cal.App.4th at p. 448.)

The detention report, which was admitted as an exhibit, recounts the social worker's interview with mother at the police station after she had been placed on a psychiatric hold. Mother admitted that during the therapy session that day she said she wanted to kill herself and her children. "She explained she did not mean the statement in a literal sense and explained she just feels overwhelmed and feels it would be easier if 'we can all just poof and disappear.' She states she does not want to suffer anymore and wishes she had a magic wand that would make the suffering disappear. She reports she has felt this way her entire life and states, 'My world is overwhelming.' 'God, if I could just get off this place.'"

In addition, CSW Huang spoke with Los Angeles police officer Williams at the station, who said "mother continues to express suicidal and homicidal ideations." Officer Williams provided CSW Huang with a document he was given by therapist Mylene Carberry of Parenting and Relationship Counseling Foundation dated February 2, 2013. It stated: "'"She [mother] said she was considering a murder suicide with herself and her kids. She felt it would be kinder than having them hurt emotionally by her each day. When told she may be suggested to put them up for adoption, she said it would be better the other way (meaning to kill them). She said they couldn't live without her. She said she didn't want to hurt them that's why killing them would be kinder."'"

At the jurisdictional hearing, mother denied making the suicidal and homicidal statements attributed to her. But she testified that it was fair to say that she made statements at the Parenting and Relationship Counseling Foundation class that led to her being at the police station. She denied saying she would kill herself or her children, but admitted she said: "'I can imagine why someone would consider murder/suicide under'—I can't remember. 'I can imagine someone would consider murder/suicide as a'—I can't remember—'as a solution,' I think." She denied that she meant that she wanted to kill herself or her children. She claimed she was making a philosophical

10

statement in a "rhetorical stance" in response to questions about whether she could see why someone had gone to that level.

Mother admitted that she told CSW Huang "'My world is overwhelming. God, if I could get off this place.'" When asked why she said that, mother said it was because her children had been taken from her, she was sitting in a police station, and she was in grief, missing her husband. Mother also testified on February 2 she told Huang that "'I no longer need to exist.'" She explained that she meant that she felt like her position as parent was not important based on what she was being told in the classes she was taking. But she denied that she meant that she would kill herself.

Mother also testified that she told CSW Huang something "close" to "'We could all just poof and disappear.'" She explained this statement: "I needed to lift up and just be in a new perspective. And out of a new reference, that I needed my vacation to Florida, which was leaving in like two weeks. Just to be in that situation [the class] wasn't working anymore. . . . I was in a police station. I didn't like the feeling of grief I was in. I wanted to just feel better."

She admitted telling CSW Huang she was feeling overwhelmed on February 2 because she had been unable to find her car keys for 20 minutes. Mother also admitted she described herself to social worker Huang as "'disorganized, forgetful and a wreck.'" She explained this was because she had lost her car keys that day (February 2, 2013).

Mother testified that she told CSW Huang that twice S.T. said, "'I wish you weren't my Mom.'" She told SCW Huang her response was "'I can arrange it if you need me to.'" At the hearing, mother explained that this was a reference to a program at Parenting and Relationship Counseling Foundation that allowed children to swap parents. She said: "I was kind of looking for him and me to have an opportunity for him to experience what it might be like if he could have a different mom-experience with some other mother. Not like for a long period of time, but him to feel the difference and me to feel the difference. So I said 'If you need that, I can arrange it maybe. We could try to make that happen.'" At the hearing she said she did not mean that she would kill herself or S.T.

11

We conclude that mother's testimony and statements at the police station on February 2, 2013 corroborate the accounts that she made suicidal and homicidal statements. There is substantial evidence to support the court's finding the children are dependents within the meaning of section 300, subdivision (b)(2), based on mother's homicidal and suicidal ideation and depression, which rendered mother unable to properly care for the children, placing them at current risk of physical and emotional harm. In light of that conclusion, we need not address the sufficiency of the evidence to support the jurisdictional finding based on physical abuse.

Mother also appealed from the original disposition order. In January 29, 2014, the court returned the children to mother's custody, with family maintenance services. We have taken judicial notice of that order. (Evid. Code §§ 452, subd. (d); 459.) We conclude that the January 29, 2014 order renders mother's appeal from the disposition order moot because mother has already obtained the relief she sought. (See *In re M.C.* (2011) 199 Cal.App.4th 784, 802.)

## DISPOSITION

The jurisdiction order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

MANELLA, J.

12