Filed 7/19/21  In re D.G. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re D.G., et al., Persons Coming Under the Juvenile Court Law. | D078326 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ15641 A-C) |
| v. | |
| M.G. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant and Appellant Mother.

Melissa A. Chaitin, under appointment by the Court of Appeal, for Minors.

Office of County Counsel, Caitlin E. Rae, Chief Deputy and Tahra Broderson, Senior Deputy, for Plaintiff and Respondent.

# I

## INTRODUCTION

The San Diego County Health and Human Services Agency (the Agency) filed dependency proceedings on behalf of 16-year old D.G., 14-year old I.G., and 8-year old K.G. (collectively, the Minors) after their 13-year old autistic brother S.G. went into cardiac arrest and died. S.G. weighed a mere 37 pounds at the time of his death and had not received medical care, dental care, or developmental services for at least three years prior to his death.

M.G. (Mother), D.G., and I.G. appeal a jurisdictional and dispositional order in which the juvenile court asserted jurisdiction over the Minors pursuant to Welfare and Institutions Code section 300, subdivision (b).[1] Mother claims the juvenile court violated her due process rights by conforming the Agency's dependency petitions to proof. Mother, D.G., and I.G. also contend the evidence was insufficient to support a finding that there was a substantial risk the Minors would suffer serious physical harm or illness due to Mother's neglect.

Finding no merit to these arguments, we affirm.

# II

## BACKGROUND

### A

Mother and J.G. (Father) have three biological children together, including an adult daughter, D.G., and I.G. They fostered several children in Arizona over the span of thirteen years and adopted two of their foster children—K.G. and S.G. D.G., I.G., and K.G. are the Minors who are the subjects of this dependency proceeding.

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

2

According to Mother, she felt fatigued and lethargic while living in Arizona. She consulted medical doctors, but they were unable to identify the source of her symptoms. She then consulted a homeopathic provider, who diagnosed her with an allergy to heat and advised her to move to a cooler climate. On the advice of the homeopathic provider, Mother moved to California with her children in 2016 or 2017. Father lived elsewhere for work and periodically visited the family.

B

S.G., the Minors' adopted brother, suffered from numerous medical ailments and developmental disabilities during his short life. He had autism spectrum disorder and chromosomal abnormalities. Further, an electroencephalogram showed he had an elevated susceptibility to seizures.

S.G. had limited speech abilities and could say only three words by the time he was three years old. He exhibited challenging behaviors as well. When he was younger, he would scream for no apparent reason, throw tantrums, and engage in repetitive behaviors. When he was older, he would hit walls and defecate and urinate in his bedroom.

S.G. received physical therapy, occupational therapy, and speech services in Arizona. He received at least some medical care from health care professionals in Arizona, including from a developmental pediatrician and an ophthalmologist. He also visited a neurologist nine times between the year 2009 (when he was three years old) and the year 2014 (when he was eight years old). S.G. weighed 32 pounds when he was three years old, but he became significantly underweight as he grew older. By the time he was eight years old, S.G. weighed just 39 pounds.

Mother did not seek out medical care or dental care for any of her children after the family moved to California. She homeschooled all of the

3

children and did not seek out physical therapy, occupational therapy, or speech services for S.G. When a social worker later asked Mother why she did not seek out medical care for her children, Mother expressed frustration about her healthcare experiences and stated she preferred homeopathic medicine. She also stated that she believed doctors do not really do anything.

C

The tragic events giving rise to these proceedings took place in the early morning hours of August 4, 2019. The afternoon prior, S.G. felt weak and unwell. Mother believed S.G. was dehydrated, so she bathed him and gave him soup and juice. S.G. appeared to feel better for a short time, but he became weak again and exhibited signs of heavy breathing. He seemed "spaced out" and was unresponsive, even though his eyes were open. Mother researched S.G.'s condition online and determined he may be suffering from "nocturnal seizures." She did not call 911; instead, she slapped S.G. in the face to try to get a response from him, gave him another bath, gave him more soup, and laid him down.

Mother and her adult daughter decided to take turns watching S.G. through the night. Mother went to sleep and was awakened a half hour later by her daughter. S.G. had stopped breathing. The daughter called 911 and the responding medics administered cardiopulmonary resuscitation on S.G. S.G. could not be resuscitated and was declared dead at the hospital a short time later. The emergency department report described S.G.'s physical appearance as "emaciated."

The Agency received a referral in connection with S.G.'s death. The medical examiner reported to the social worker that S.G. died due to sudden cardiac arrest. He reported S.G. was undernourished, but he had "good fat reserves" and was not malnourished. He added that the parents could have

4

"done better," but S.G.'s death was "not necessarily preventable." On an amended death certificate, the medical examiner stated S.G. suffered a sudden cardiac death accompanied by factors including probable seizure disorder, anoxic encephalopathy (lack of oxygen to the brain), caloric malnutrition, and failure to thrive.

The social worker requested well-child examinations for the Minors. Mother—in accordance with her preference for homeopathy—took the Minors to a naturopathic doctor for the examinations. According to the reports from the examinations, the Minors were well-developed and well-nourished. However, the reports noted I.G. and K.G. suffered from anxiety, K.G. had two suspected cavities, and D.G. had a methylenetetrahydrofolate reductase (MTHFR) gene mutation, a condition that can cause elevated enzyme levels. Laboratory tests were also ordered to determine whether D.G. suffered from an endocrine disorder called Addison's disease.

D

On October 22, 2019, the Agency requested a paper consultation with Dr. Shalon Nienow, a child abuse expert at the Chadwick Center for Children and Families at the University of California San Diego. Dr. Nienow reviewed a written narrative and photographic documentation from the medical examiner, statements Mother made to law enforcement, S.G.'s medical records from Arizona, the emergency department's report from S.G.'s hospital visit, and statements from the Minors. On January 23, 2020, Dr. Nienow provided the Agency with a report of her impressions.

In her report, Dr. Nienow made three findings of relevance here. First, she concluded S.G. suffered from malnourishment that was diagnostic of starvation and the parents' failure to seek medical care for S.G. was diagnostic of medical neglect. She noted S.G. weighed a mere 37 pounds at

5

the time of his death—one-third the weight of an average child his age. She noted S.G. had "no subcutaneous fat and markedly underdeveloped musculature." Further, she noted S.G. had consumed non-food items, such as paint, plaster, and carpet, and opined that S.G.'s "starvation was so severe that it would have caused [him] physical pain, and an uncontrollable drive to obtain and consume calories in any form."

Second, Dr. Nienow determined Mother's failure to seek medical attention in the hours preceding S.G.'s death was definitive evidence of medical neglect. She noted S.G. was unconscious and exhibited signs of respiratory distress, but no medical care was sought.

Third, Dr. Nienow concluded S.G.'s "case [met] the medical diagnostic criteria for torture." She opined that S.G.'s starvation "would have caused him prolonged physical pain and emotional distress, and ultimately led to his death." She also found that S.G. "suffered numerous forms of psychological maltreatment," such as "isolation, terrorizing, and medical/educational neglect."

E

On February 10, 2020, the Agency filed petitions alleging the Minors were within the jurisdiction of the juvenile court because their parents caused the death of another child through abuse or neglect. (§ 300, subd. (f).) They alleged Mother "caused the death of another minor, [S.G.] through abuse or neglect in that at the time of his death [S.G.] was grossly malnourished and weighed 37 pounds. He had been deprived of adequate nourishment and medical care for at least three years preceding his death. Further, despite the child's obvious medical distress on the night of his death … [M]other did not seek medical intervention until after the child was deceased." The petitions alleged Father "was sporadically present in the

6

family home and failed to take any action to provide for [S.G.'s] well-being despite the child being visibly emaciated."

In its detention report, the Agency recommended the Minors be detained with the parents.[2] Still, the Agency stated it was "concerned about the health and safety of [the Minors] and [was] requesting that the court monitor the children to ensure that their basic needs [were] met." The Agency appended documents to the detention report including Dr. Nienow's report, the amendment to the death certificate, the records from the Minors' examinations with the naturopathic doctor, a law enforcement incident report, and photographs from S.G.'s autopsy.

Counsel for Mother, counsel for Father, and counsel for D.G. and I.G. agreed with the Agency's detention recommendation. Counsel for K.G. contested the detention recommendation.

At the contested detention hearing, K.G.'s counsel called Dr. Nienow to testify. She discussed the basis for her report and the conclusions set forth in the report. She opined K.G. would be at risk if left in Mother's care given that the removal of an index child—i.e., a child upon whom severe abuse or neglect is inflicted—can create a substantial risk that another child in the household will be chosen to take the place of the index child. She testified K.G. suffered from emotional abuse to the extent she was forced to witness S.G.'s starvation. Further, she testified K.G. suffered from potential medical neglect because she had anxiety and bipolar disorder for which she was not receiving psychiatric services.

The court found the Agency made a prima facie showing under section 300, subdivision (f). It detained D.G. and I.G. with their parents on the condition that the parents: (1) comply with voluntary services

---

[2] Father moved back into the family home in August 2019.

recommended by the Agency, (2) ensure the children attended school and therapy, and (3) make the children available to their legal counsel and the Agency. The court did not detain K.G. with the parents; instead, it detained her in the Polinsky Children's Center or an adjunct or licensed foster care. The court reasoned K.G. faced a higher risk of danger in the family home due to her young age, her untreated bipolar disorder, and her status as an adopted child.

F

In its jurisdiction and disposition report, the Agency recommended the court make true findings on the petitions, declare the Minors dependents, and provide services. It recommended that D.G. and I.G. be placed with the parents and K.G. be placed outside the family home.

Although the report recommended that D.G. and I.G. be placed in the family home, it stated "[t]he minors ha[d] suffered, or there [was] a substantial risk that the minors [would] suffer, serious physical harm or death by the [M]other's unsafe and neglectful care …." It stated Mother "still [did] not appear to understand how her actions resulted in [S.G.'s] death, even though he was extremely underweight, malnourished, and had not received any medical care for the last 3 or more years." Further, it stated the parents needed to be "more transparent in the manner of care they [were] providing their children … and display an understanding of safety risks in regards to severe neglect, specifically failure to thrive, in order to be confident that the family could function without Agency and Court oversight."

The Minors' counsel submitted on the Agency's recommendations. However, the parents' counsel requested that the court set the matter for trial.

8

The Agency filed an addendum report in advance of the contested jurisdiction and disposition hearing. It stated the parents completed a parenting course, but on the advice of counsel had declined to participate in a child abuse group. It stated the social worker tried "to discuss monthly with the mother and the father the Agency's concerns, ways in which the mother and father could provide/have provided safety to the minors, and what the mother and father could have done differently to prevent the death of the minor [S.G.]." However, the parents reportedly were not transparent concerning "how they plan[ned] to mitigate the dangers," and stated they were "advised by their attorneys not to answer questions pertaining to the allegations."

G

The jurisdiction and disposition hearing took place over five days on August 14, August 21, August 28, September 24, and October 7. On the first day of the hearing, the court received into evidence the detention report, the amendment to the death certificate, the jurisdiction and disposition report, and the addendum report.

Dr. Nienow testified on the first day of the hearing. She testified S.G. was the victim of "profound starvation" and torture. She based her opinion on S.G.'s "normal growth velocity for the first four years of his life" and his "extreme state of malnutrition" at the time of his death. According to Dr. Nienow, the starvation amounted to torture because it was a "prolonged event that … cause[d] physical pain and emotional distress." Dr. Nienow testified it was "plausible" the "starvation played a role in his demise" and it was "feasible that [S.G.] would be alive today" if Mother had sought medical aid in the hours before he died.

9

Dr. Nienow testified about the Minors as well. She testified the Minors were subject to psychological maltreatment because they were forced to witness S.G.'s starvation and torture. Further, she testified "the children" faced a "very real" risk of abuse or neglect due to the possibility that the parents would select a new index child to starve or torture.[3]

Investigating social worker Jason Anthony testified on the first and second days of the hearing. He testified S.G. did not receive services despite his autism spectrum disorder diagnosis, none of the children received medical care in California, and I.G. and K.G. did not receive mental health services for their anxiety. Anthony testified he was concerned that S.G. did not receive services and that the Minors did not receive medical care or mental health services. However, he testified that, at least during the investigatory stage of the case, he was not concerned the Minors were being neglected, underfed, or targeted for abuse.

Social worker Krista Paddock testified on the second and fourth days of the hearing. She testified about the services in which the parents were engaged, among other topics. She testified Mother completed parenting courses, but declined to participate in a child abuse group. Paddock testified Mother, acting on the advice of counsel, would not speak to her about the protective issues underlying the petitions. She testified the Agency was therefore unable to work with Mother on any of the protective issues giving rise to the proceedings.

Pathologist and toxicologist Dr. Marvin Pietruszka testified on the second day of the hearing. Based on his review of the case files,

---

[3]    Dr. Nienow also testified in rebuttal to the testimony of Dr. Marvin Pietruszka. Dr. Pietruszka's testimony will be summarized later in the opinion.

Dr. Pietruszka believed S.G. suffered seizures throughout his life resulting in hypoxic encephalopathy, i.e., loss of oxygen to the brain. He testified he did not believe S.G.'s death was preventable because S.G. had suffered hypoxic changes to his brain over time which would have been very difficult for Mother to identify. Further, he testified he did not believe S.G. was intentionally starved; rather, he believed S.G. was undernourished because he had anorexia nervosa, did not have an appetite, and suffered an intolerance to certain foods.

At the end of the second hearing day, the court stated it did not want to "take the parties by surprise" and, for that reason, it was notifying them that at the close of evidence it might ask them to address whether jurisdiction was proper under section 300, subdivision (b). The next hearing day, K.G.'s counsel stated she was "putting all counsel and parties on notice that if necessary [she would] be asking the court to conform to proof and sustain a Welfare and Institutions Code [section] 300(b) or 300(j) count." No party objected or requested a continuance.

D.G. testified on the third day of the hearing. He testified he liked living with his parents and felt safe living with them.

The parties presented closing arguments on the fourth and fifth days of the hearing. The Agency's counsel asked the court to make a true finding on the petitions under section 300, subdivision (f). But she stated the Agency did not believe section 300, subdivision (b) fit the facts of the case. She stated it was "highly concerning" the Minors had not seen a medical professional for so long, but the "Agency [did not] feel that [subdivision] (b) quite capture[d] the factual background of [the] case" because the court could assume jurisdiction under subdivision (b) only if it found "the children [were] at a

11

current risk of physical and not emotional harm based upon [the parents'] failure to provide medical care."

Counsel for D.G. and I.G. submitted on the Agency's recommendations. He stated he did not believe an assumption of jurisdiction was proper under section 300, subdivision (b) because he "[didn't] see any current substantial risk of abuse or neglect to [D.G.] or [I.G.]."

Counsel for K.G. adopted the Agency's arguments concerning section 300, subdivision (f), and urged the court to sustain the petitions as originally pleaded. However, K.G.'s counsel argued that, in the alternative, the "facts [were] sufficient to conform the petition to [proof] and sustain a [subdivision] (b) petition as to [S.G.]" and a "[subdivision] (j) petition" as to the Minors.

Mother's counsel argued the court should dismiss the petitions. In relevant part, she argued a true finding under section 300, subdivision (b) was unwarranted because the Minors did not face a substantial risk of serious physical harm. Additionally, she stated that, "when lacking notice, there are due process rights that would be violated for the Mother should the court make a true finding on a 300(b)."

After closing arguments, the court found the "weight of the evidence support[ed] the conclusion that [S.G.'s] death was triggered by a seizure." It noted the evidence was "too murky" to find that S.G.'s malnourishment caused his death. It also found there was too much uncertainty concerning whether S.G. could have been saved if Mother had sought prompt medical

intervention in the hours before his death.  Therefore, the court declined to assume jurisdiction under section 300, subdivision (f).[4]

Then, the court opined that it had authority to conform the petitions to proof "so long as the variance between pleading[s] and proof [were] not so wide that [they] would prejudice a party or violate due process to make the amendment[s]."  The court stated it had "put the parties on notice that they should be prepared to answer the question of whether the facts as alleged support[ed] a jurisdiction under 300(b)."  It also stated the parents were not "deprived of an opportunity to contest the allegation."

The court then found the parents' "obvious neglect" placed the Minors at a substantial risk of serious physical harm and, therefore, the court would assume jurisdiction under section 300, subdivision (b).  The court stated jurisdiction was based on "the exact facts alleged in the [section] 300(f) petition[s]," namely that S.G. was "grossly malnourished," weighed 37 pounds, and was deprived of adequate nourishment and medical care for at least three years.  The court noted Mother did not seek medical intervention until S.G. was deceased despite his "obvious medical distress on the night of his death …."  It found the Minors "suffered from minor issues that were not being addressed," but a "minor problem today, like a cavity can turn into significant damage if not treated."  Further, it found Mother "demonstrated such an extreme aversion to conventional medical and dental care" that she was "unable to safely parent her children …."

---

[4]     The court harshly critiqued the credibility of both testifying experts.  It found Dr. Nienow's opinions concerning torture "strain[ed] credulity" and conflicted with other evidence in the record.  It also faulted Dr. Pietruszka for downplaying S.G.'s "obvious deterioration."  According to the court, both experts took "extreme and frankly unbelievable positions in this case on issues that matter[ed]."

13

The court placed the Minors with the parents, ordered family maintenance services, and scheduled a family maintenance review in six months.

## III

## DISCUSSION

### A

### *Overview of Dependency Proceedings*

" 'Dependency proceedings in the juvenile court are special proceedings with their own set of rules, governed, in general, by the Welfare and Institutions Code.' [Citation.] 'Under section 300, a child who is neglected or abused falls within the juvenile court's protective jurisdiction as a "dependent child of the court." ' " (*In re M.C.* (2011) 199 Cal.App.4th 784, 790.) " ' "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time." ' " (*In re Summer H.* (2006) 139 Cal.App.4th 1315, 1324.)

"The basic pleading device in a dependency case is a petition. It may be an original petition (§ 332), a subsequent petition for children who are already dependents when there are 'new facts or circumstances' that bring them within a category of section 300 'other than those under which the original petition was sustained' (§ 342), or a supplemental petition when there are facts which indicate that a previous disposition is not appropriate. (§ 387.)" (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1035.) Section 332, subdivision (f) governs the substantive requirements of an original petition and mandates that the petition contain "[a] concise statement of facts, separately stated, to support the conclusion that the child upon whose behalf

14

the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted."

When dependency is contested, the county social services agency typically commences the dependency proceeding by filing the petition with the juvenile court. (§ 325 ["A proceeding in the juvenile court to declare a child to be a dependent child of the court is commenced by the filing with the court, by the social worker, of a petition …."].) The social services agency " 'serves an executive function when it acts as the prosecuting arm of the state and initiates a juvenile dependency proceeding.' " (*In re M.C., supra*, 199 Cal.App.4th at p. 810.) " 'The same is true during the course of the dependency proceeding, in which the social services agency bears the burden of proof.' "[5] (*Ibid*.) Meanwhile, "the juvenile court is authorized to make orders pertaining to abused or neglected children who come within the court's jurisdiction. (§§ 361, 362.)" (*In re Ashley M.* (2003) 114 Cal.App.4th 1, 7.)

"In dependency proceedings, there are generally four phases: (1) detention and jurisdiction; (2) disposition; (3) the provision of services for reunification or family maintenance, accompanied by periodic review hearings; and (4) either a permanent plan for the child's placement outside of the parent's home or termination of the dependency." (*In re Paul W.* (2007) 151 Cal.App.4th 37, 44.) "At the jurisdictional hearing the juvenile court determines whether the allegations in the petition that the minor comes within section 300 (and therefore within the juvenile court's jurisdiction) are true. The court's jurisdictional findings must be based on a preponderance of the evidence. (See § 355.)" (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1432.)

---

[5] The social services agency performs quasi-judicial functions as well, such as when it provides statutorily-mandated social study reports and recommendations to the court. (*In re M.C., supra*, 199 Cal.App.4th at p. 810.)

"Given the haste with which petitions are sometimes drafted, and section 332's statement that only a 'concise statement of facts is required,' the ability to amend according to proof plays an important role in the overall dependency scheme." (*In re Jessica C., supra*, 93 Cal.App.4th at p. 1041.) Section 348 "provides that provisions in the Code of Civil Procedure relating to variance and amendment of pleadings in civil actions apply to juvenile dependency petitions and proceedings." (*In re Andrew L.* (2011) 192 Cal.App.4th 683, 688–689.) Amendments to conform to proof are favored so long as the proposed amendment does not mislead an adversarial party to its prejudice. (*In re Jessica C.,* at p. 1042.) However, "[i]f a variance between pleading and proof ... is so wide that it would, in effect, violate due process to allow the amendment, the court should, of course, refuse any such amendment." (*In re Andrew L.,* at p. 689.)

B

*Mother Has Not Established a Due Process Violation*

Mother contends the juvenile court violated her due process rights when conforming the petitions to proof and assuming jurisdiction under section 300, subdivision (b). Mother's due process argument has two components. First, she claims the court impermissibly acted as both advocate and trier of fact when it conformed the petitions to proof. Second, she asserts the court denied her adequate notice, and an opportunity to argue against, the jurisdictional allegations.

During closing arguments, Mother's counsel argued that a true finding under section 300, subdivision (b) would violate Mother's due process rights. However, the sole basis for the objection was that Mother failed to receive notice that jurisdiction would be asserted under subdivision (b); Mother's counsel never argued that Mother was deprived of an impartial arbiter. To

16

the extent Mother now claims the court impermissibly acted as both trier of fact and advocate, Mother forfeited her argument by failing to raise it below. (*In re A.A.* (2012) 203 Cal.App.4th 597, 606 [mother forfeited constitutional challenges to placement order]; *In re Wilford J.* (2005) 131 Cal.App.4th 742, 754 [father forfeited argument he was deprived of due process right to notice in dependency proceeding].)

As noted, Mother's counsel stated Mother did not have adequate notice the court might assume jurisdiction under section 300, subdivision (b). This statement, although technically not phrased as an objection, was sufficient to preserve Mother's notice-based argument for appeal. It afforded the juvenile court a chance to assess the issue of notice in the first instance. Indeed, the court expressly discussed notice when rendering its jurisdictional findings. Therefore, we turn to the merits of Mother's notice-based argument.

"[P]arents in dependency proceedings are not generally entitled to the same due process protections as criminal defendants. [Citation.] Dependency proceedings are civil in nature and nonpunitive. [Citation.] In the civil context, ' " '[d]ue process requires only that the procedure adopted comport with fundamental principles of fairness and decency.' " ' " (*In re William M.W.* (2019) 43 Cal.App.5th 573, 587–588.) Even so, "a parent whose child may be found subject to the dependency jurisdiction of the court enjoys a due process right to be informed of the nature of the hearing, as well as the allegations upon which the deprivation of custody is predicated, in order that he or she may make an informed decision whether to appear and contest the allegations." (*In re Wilford J., supra*, 131 Cal.App.4th at p. 752.)

In the present case, the Agency filed petitions pursuant to section 300, subdivision (f), which applies when a "child's parent or guardian caused the

17

death of another child through abuse or neglect."[6] The petitions alleged in relevant part that Mother caused S.G.'s death because 13-year-old S.G. was "grossly malnourished and weighed 37 pounds" when he died, was "deprived of adequate nourishment and medical care for at least three years preceding his death," and, "despite [S.G.'s] obvious medical distress on the night of his death the mother did not seek intervention until after [S.G.] was deceased." If Mother had received no other notice that the juvenile court might assume jurisdiction under section 300, subdivision (b), we would be inclined to agree with her that she did not receive sufficient notice and an opportunity to be heard, as due process demands.

But this was not the only notice Mother received concerning the legal theories on which jurisdiction might be asserted. On August 21—nearly a month and a half before the last day of the contested hearing—the court instructed the parties to be prepared to argue whether the facts supported an exercise of jurisdiction under section 300, subdivision (b). Then, on August 28—still more than a month prior to the last hearing day—K.G.'s counsel stated she planned to ask the court to conform the petitions to proof and sustain them under section 300, subdivisions (b) or (j). Mother was represented by counsel at both the hearings during which these statements were made. Further, there is no indication Mother was thereafter precluded from opposing, or hindered in her ability to oppose, the exercise of jurisdiction under section 300, subdivision (b).

---

[6] Section 300, subdivision (f) reflects a legislative determination "that a parent's or guardian's neglectful or abusive responsibility for a *child fatality* may *inherently* give rise to a serious concern for the current safety and welfare of living children under the parent's or guardian's care, and may thereby justify the juvenile court's intervention on their behalf without the need for separate evidence or findings about the current risk of such harm." (*In re Ethan C.* (2012) 54 Cal.4th 610, 638.)

18

The basic facts underpinning the court's assumption of jurisdiction were also well-known. The issue of Mother's years-long failure to procure medical care for *any* of her children was central to the proceedings below. It prompted the Agency to request well-child examinations for the Minors. The issue—together with Mother's aversion to medical care—was discussed extensively in the detention report and in the jurisdiction and disposition report, as well as during the jurisdiction and disposition hearing. Further, the Agency on numerous occasions articulated its stance that the Minors would face a substantial risk of physical harm if they were left in Mother's care.[7]

Mother disputed the Agency's position and put on evidence at the jurisdiction and disposition hearing to establish that the Minors were physically healthy and well-nourished. But the fact Mother presented such evidence suggests she had notice and an opportunity to contest the jurisdictional allegations—an opportunity she fully exercised. Tellingly,

---

[7]    For example, the Agency stated the following in the jurisdiction and disposition report: "The minors have suffered, or there is a substantial risk that the minors will suffer, serious physical harm or death by the mother's unsafe and neglectful care resulting in the death of their sibling, [S.G.]. Returning [K.G.], who is now the only adopted child in the family and is at a young age of eight, to an unchanged environment leaves her at continued risk of harm due to mother's neglect. In addition, the mother is unable to identify how her own ideas of an appropriate diet for children and lack of medical care could be extremely unsafe and possibly harmful."

To take another example, the Agency stated the following in its addendum report: "[S.G.'s] starvation did not occur overnight and was a result of prolonged deprivation, which was entirely in the  parents' control and with proper nutrition and/or medical care his life could have been saved. The mother and father continue to display a lack of understanding of safety risks in regards to severe neglect, specifically failure to thrive, and the Agency is not confident that the mother and father would be able to safely care for the minor's [sic] without Agency and Court oversight."

Mother does not identify any additional or different evidence, witnesses, or arguments she would have presented during the hearing if the original petitions had been filed under section 300, subdivision (b).

Because Mother had notice and an opportunity to contest the jurisdictional allegations, Mother has not established a violation of her due process rights.

C

*Substantial Evidence Supported the Jurisdictional Findings*

Mother, D.G., and I.G. argue there was insufficient evidence to support the jurisdictional findings under section 300, subdivision (b).  They claim there was not substantial evidence to establish that Mother's conduct would place the Minors at a substantial risk of serious physical harm or illness.

Section 300, subdivision (b)(1) provides in relevant part that a child comes within the jurisdiction of the court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child … or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment …."  The court found the Minors met these criteria and thus assumed jurisdiction over the Minors.

We review the juvenile court's jurisdictional findings for substantial evidence.  (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1225.)  " 'We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.  [Citation.]  The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' "  (*Ibid.*)  "The substantial evidence standard

20

of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

Mother, D.G., and I.G. argue there was insufficient evidence of a substantial risk of serious physical harm or illness because the Minors had only relatively minor medical ailments, such as anxiety and cavities, at the time of the jurisdiction and disposition hearing. Moreover, Mother claims these issues were being treated by the time of the hearing. She emphasizes the Minors were in therapy and had visited, or were scheduled to visit, a dentist.

We are not persuaded that a substantial risk was absent merely because the Minors were not suffering serious physical harm or illness at the time of the hearing. "A dependency court is not required to 'wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.' " (*In re J.M.* (2019) 40 Cal.App.5th 913, 921; see *In re K.B.* (2021) 59 Cal.App.5th 593, 603 ["The court need not wait for disaster to strike before asserting jurisdiction. [Citation.] This is why the statute uses the word 'risk.' "]; accord *In re Petra B.* (1989) 216 Cal.App.3d 1163, 1169 ["The issue before the court … was not merely whether the wounds had healed but whether [the minor's] parents were capable and willing to exercise proper medical care."].) "The focus of section 300 is on *averting* harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133, italics added.)

Where, as here, "jurisdictional allegations are based solely on risk to the child, and not on past injury, a juvenile court ordinarily determines whether a substantial risk of harm exists at the time of the jurisdiction hearing." (*In re J.M., supra*, 40 Cal.App.5th at p. 921.) " 'Some risks may be substantial even if they carry a low degree of probability because the

magnitude of the harm is potentially great.... Conversely, a relatively high probability that a very minor harm will occur probably does not involve a "substantial" risk. Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm.' " (*In re I.J.* (2013) 56 Cal.4th 766, 778.)

It may be true, as Mother, D.G., and I.G. suggest, that there was a relatively low *probability* the Minors would suffer serious physical harm or injury due to the fact that they were, at least at the time of the hearing, generally healthy and well-nourished. Nonetheless, we believe there was substantial evidence to support a finding of substantial risk due to the great *magnitude* of the potential harm they could suffer. (See *In re S.R.* (2020) 48 Cal.App.5th 204, 222 ["the record contains substantial evidence of a substantial risk of great harm, even if the probability of that risk was low"].)

Ample evidence was introduced showing that Mother failed to seek out any medical care for three or more years for S.G. as his state of gross malnutrition tragically deteriorated from bad to worse to life-threatening. By the time 13-year-old S.G. died, he weighed a mere 37 pounds—one third the weight of an average child his age—and he was "emaciated," as noted in the report from the hospital emergency department. Our own review of the photographs from S.G.'s autopsy corroborates the emergency department's description. From this evidence, we could not agree more with the juvenile court in its assessment that S.G. was in a "wretched condition for a 13-year-old boy," and yet still Mother deprived him of any form of medical care.

Even in the hours preceding S.G.'s death, while he lay unresponsive and struggling to breathe, Mother did not seek out potentially life-saving medical care for him. The juvenile court found there was no guarantee that prompt medical intervention would have saved his life. But it also noted that

22

Mother "didn't even try," and the evidence in the record supports this finding. Mother's past failure to procure medical care or intervention for S.G.—either in the prolonged period during which he became grossly malnourished, or in the hours preceding his death while he lay in a state of obvious distress—are probative of the current risks Mother's neglectful conduct poses to the Minors. (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993 ["evidence of past conduct may be probative of current conditions"]; accord § 300, subd. (j) [in assessing whether there is a substantial risk that a child will be abused or neglected, a court should consider the abuse or neglect of the child's sibling].)

Further, we have no sound reason to believe Mother would be any more willing to seek out essential medical care now if the Minors were in similar life-threatening circumstances. The juvenile court found Mother harbored an "extreme aversion to conventional medical and dental care," a finding that is amply supported by the record. There was also evidence in the record suggesting that Mother's aversion persisted even after S.G. died.

For instance, in the detention report, the Agency stated that Mother told the social worker she was frustrated with medical professionals and believed "doctors do not really do anything." In the jurisdiction and disposition report, the Agency noted that Mother refused to discuss the Minors' dietary habits or to grant the Agency access to information concerning the Minors' previous medical care. In the addendum report, the Agency opined that Mother was not transparent about how she planned to mitigate dangers that the Minors might face and, furthermore, Mother lacked understanding regarding safety risks and severe neglect. And, at the jurisdiction and disposition hearing, social worker Paddock testified that Mother would not speak with the Agency about the protective issues underpinning the case.

Collectively, this evidence gives rise to a reasonable inference that at the time of the hearing Mother continued to lack understanding concerning risk assessment and the necessity of medical treatment. Together with the evidence of Mother's past neglectful conduct, it supported the juvenile court's finding of substantial risk and justified the assumption of jurisdiction over the Minors. (See *In re John M.* (2012) 212 Cal.App.4th 1117, 1124–1125 [substantial evidence supported jurisdictional finding where mother's "subsequent comments and conduct offered no indication that [past conduct] was a unique situation or that mother was unlikely to engage in similar behavior in the future"]; *In re Petra B., supra*, 216 Cal.App.3d at p. 1170 [parents' continuing "confusion about proper medical treatment posed a then existing threat to [minor's] well-being and justified the court's assumption of jurisdiction"].)

## IV

## DISPOSITION

The order is affirmed.

McCONNELL, P. J.

WE CONCUR:

HALLER, J.

IRION, J.

24